(No. 14070.—Reversed in part and remanded.)

JOHN A. HERPICH *et al.* Appellees, *vs.* DANIEL B. WILLIAMS, Appellant.

*Opinion filed December 22, 1921.*

1. CONTRACTS—*reliance upon fraudulent representations is not negligence.* Although the parties are dealing at arm's length the law does not require that either shall believe the statements of the other, and the rule is that no person who by his fraudulent act has induced another to act to his prejudice can impute negligence to the latter merely because of his reliance upon the former's fraud.

2. DEEDS—*when deed given as part consideration for purchase of farm property may be set aside for misrepresentations.* In a suit to set aside a deed to city property given as part consideration for the purchase of farm land on the ground of the fraudulent acts and representations of a real estate agent, who negotiated the transaction in his own interest, the question whether the sale was fraudulent is one of fact; and where the representations as to the character of the land were material, were falsely and knowingly made by the agent and were relied upon by the complainants to their loss the deed may be set aside, even though the complainants, who knew nothing of the value of farm land, made a partial examination of the land before executing the deed, which was never acknowledged by the grantors but was fraudulently acknowledged for them by the agent.

3. SAME—*acknowledgment of deed may be impeached by clear and convincing evidence.* The acknowledgment of a deed cannot be impeached for anything but fraud and can be overcome only by evidence clear and convincing beyond a reasonable doubt, but where the evidence clearly establishes that the acknowledgment is a fraud it will not be allowed to stand.

4. MASTERS IN CHANCERY—*when court should hear evidence on question of master's fees.* As the statute provides that masters in chancery shall receive such compensation as the court may deem just for examining questions referred to them and reporting conclusions thereon, the amount to be allowed a master for his per diem work cannot be based upon what masters usually charge but rather should be fixed upon evidence heard before the chancellor with reference to the amount of time consumed and the proper charges for the various items.

APPEAL from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

M. V. MINAHAN, for appellant.

CHARLES M. HAFT, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed in the circuit court of Cook county by appellees, praying that an instrument purporting to convey title to two lots in Cook county from appellees to appellant be set aside as a cloud upon their title. The cause was referred to a master, and after hearing the evidence he reported in favor of setting aside the deed as fraudulent, and thereafter, on a hearing before the chancellor, the master's report was affirmed and a decree entered setting aside the deed as having been procured by fraudulent representations. From that decree this appeal has been prayed.

Appellant, Williams, has been engaged in the real estate business in Chicago for many years. John A. Herpich at the time of this transaction was sixty-one years of age, and his wife, Pauline, a few years younger. Neither of them had had much experience in worldly affairs, he being a finisher in a table factory and she a housewife. Neither of them had ever lived on a farm or knew anything of farm land. Kate O. Wellman had been the owner of a tract of land containing slightly less than twelve acres near Michigan City, Indiana. Appellant for several years preceding this transaction had two agency contracts with Mrs. Wellman for the sale of this land for her. He had advertised the property for sale, and in August, 1919, he advertised it in the *Chicago Daily News* as a beautiful home, ten minutes' ride from Michigan City, with fine buildings and a bearing fruit orchard and rich garden land. Mrs. Herpich saw this advertisement in the *Daily News* and called at appellant's office on August 25, 1919, and had a talk with him about the farm. He told her about the farm and also gave her a typewritten description substantially to the same effect as the *Daily News* advertisement but stating a few more details, and arranged with her that on the following

Sunday she and her husband should go with him to Indiana to visit the farm. The evidence shows that on that Sunday, August 31, appellees met appellant and a Miss McDonough at the Michigan Central depot in Chicago and went with them to Michigan City. They reached there shortly before eleven o'clock in the forenoon, and he obtained an auto and drove the four of them to the farm, reaching there a little after eleven. The place was unoccupied and he took them through the house and barn and onto the land, but the master finds in his report that he did not take them over the land but only around its outer boundaries. The master also finds, and the evidence supports his conclusion, that running through the farm is a small creek; that along the east side of the creek is a slough or low, marshy ground entirely unfit for cultivation unless thoroughly drained, and that the slough comprises about one-half of the farm; that the farm at the north end is about half the width of an average city block, or about 370 feet, and the south end about twice as wide; that it is considerably longer than its greatest width; that appellant did not, on the Sunday in question, take appellees where they could see over the entire tract of land, and that nothing was said by him to them about the slough or marsh, and both of appellees testified they did not see anything of the slough or marsh on that day; that the portion of the land that is called by the witnesses "high land" is sandy and gravelly soil, of not a very productive character unless fertilized; that appellant said to appellees, pointing to the land, "Isn't that fine soil? It will grow anything." This testimony was given by Miss McDonough, appellant's friend who accompanied him there; that he also said to them that the land would grow good corn and good garden truck; that it would raise anything. The master finds that these representations of appellant as to the character of the soil and what it would grow were not true; that the land would not raise very much corn or potatoes and that it was necessary to fertilize

it well in order to grow good garden truck. The evidence tends to show that appellant and appellees, with Miss Mc-Donough, stayed on the farm not more than forty-five minutes or an hour, and then, as Williams stated that he had to hurry back to keep an engagement in Chicago, they drove back to Michigan City in the auto, and, finding the train was not on time, sat in a little park until the train came and talked about the trade; that as the result of this talk appellant took from his pocket a blank contract for the sale of the farm and filled it out, inserting the conditions that the farm was to be sold for $3600 to appellees and that he was to take in exchange their two lots for $1800, the balance to be paid in cash, with the other conditions as to title and abstract that are usually contained in contracts for the sale of land. Herpich paid appellant $23 in cash with which to bind the bargain, that being all the money he had, with the understanding that he was to pay a balance up to $500 very shortly. Appellees and appellant and Miss McDonough returned to Chicago, reaching there about three o'clock in the afternoon. They separated, and appellees went to their home on the south side in Chicago and appellant went to a ball game. That evening appellant visited them, Miss McDonough still accompanying him, and asked them to sign a deed conveying to him the two lots they had agreed to trade as part payment for the Indiana farm. There were present at the time of this visit the married daughter of appellees and her husband. Both appellees and their daughter and son-in-law testified that the deed contained no description of any property and was blank except as to the printed part, and that appellant told appellees that that was all right,—that he could fill out the description later on. Appellant and Miss McDonough testified that the deed contained a description of the lots at that time, but they do not claim that it was then acknowledged but that he arranged with appellees to have it acknowledged later. He gave as his excuse for coming to get the deed

signed that night that he had to leave town next day and wanted to get the matter closed up as far as possible.

Appellant testified that the day after Labor day,—that is, September 2,—the appellees came to his office and acknowledged the deed before a lawyer, who was a notary public and who occupied the same suite of rooms with him, and this notary public testified on the trial that both appellees met him that day in his office and acknowledged the deed and it was recorded the same day in the recorder's office of Cook county by appellant. Appellees both testified that they never went to appellant's office to acknowledge the deed, Herpich testifying that he had never been in the office of appellant at any time, and Mrs. Herpich testifying that she had never been in his office on any occasion other than August 25,—the time she made the appointment to make the trip the following Sunday to the farm in Indiana. Herpich testified that on September 2 he was working in his place of employment all day, from nine in the morning until after five in the evening. Several witnesses who were co-employees of Herpich, his foreman and the time-keeper, testified to the same effect, the time-book showing that Herpich worked there all that day, and the system of punching on a time-card the time when an employee went to work and when he quit showing the same fact. The master found that appellees never signed the deed to the Chicago lots, that their acknowledgment had never been taken, that neither of them had ever been in appellant's Chicago office after the trip to the Indiana farm, and that on September 2, the date of the purported acknowledgment of the deed, Herpich was working all day at his usual place of employment.

The evidence tends to show that within a day or two after the Sunday in question, in talking with their grown son and married daughter with reference to this transaction, appellees became suspicious of the truth of the appellant's statements as to the farm, and on the Sunday following their trip with appellant to the farm the son and son-in-law

drove with appellees in an auto from Chicago to the farm in Indiana and examined it, and then for the first time they found the marshy and wet condition of much of the soil and decided that they had been defrauded and thereupon refused to go on with the trade.

The master finds, and the evidence shows, that for several years prior to the sale of this land to appellees by appellant he had made ineffectual attempts to sell it for Mrs. Wellman, who was then the owner; that on September 4, 1919, five days after the contract here in question, appellant obtained a deed from Mrs. Wellman for the farm for the consideration of $1600, he paying her $600 for her equity and assuming an unpaid balance of $1000 of a mortgage on the farm. He testified that he had been trying to sell the land for some time on account of Mrs. Wellman's straitened circumstances and because of the insistence of the holder of the mortgage that the mortgage be paid, and he finally took the land for the price in question because it was necessary to do so in order to take care of the mortgage and pay the claims that were held against Mrs. Wellman in connection with the transaction. We find nothing in the record to indicate why, when the land was in her name at the time the contract with appellees was made, the contract was not made between her and them.

The master found that the farm, at the time the contract in question was entered into, was worth not to exceed $1800. However, there is testimony in the record given on behalf of appellant by two or three witnesses who had never bought or sold any farm land in that vicinity, that the farm was worth from $3500 to $3800. Edward G. Moniger, a former partner of appellant but at that time not connected with him, testified that the farm was worth in 1919 about $1750.

If the master's finding and the decree of the court are correct that the sale of the land was fraudulent, the other questions raised in the briefs need not be considered or

300—35

decided. There can be no question from this record that appellant told appellees, both before and after the contract for the sale of the farm was signed, that it was good, rich garden land, and that he did not in any way particularly call their attention to the slough or wet land on the farm, and the weight of the evidence shows that the high land was sandy and not of the best character for crop raising and that it was impossible to cultivate the marshy land and raise crops thereon, it being impracticable, as it was situated, to drain the swamp land. The question whether the sale was fraudulent is one of fact. The representations as to the character of the land were material. If they were falsely and knowingly made by appellant and were relied on by appellees the latter would be entitled to have the deed to the Chicago lots set aside on the ground of fraud.

Appellant argues that the representations, if proved, were matters of fact equally open to inquiry by either party, and that as appellees visited the farm in question before they signed the contract they were bound to make use of any knowledge at hand and use reasonable means to ascertain the real facts, and failing to do so they cannot obtain relief. This court has decided this is not the law; that where two persons are dealing at arm's length the law does not require that either shall believe the statements of the other. The rule is that no person who by his fraudulent act has induced another to act to his prejudice can impute negligence to the latter merely because of his reliance upon the former's fraud. (*Leonard* v. *Springer,* 197 Ill. 532.) "Where one party to a transaction makes a positive statement of a material fact as true which he knows to be false but intends to be relied upon by the other party as true, and the statement actually is relied and acted upon as true by the other party, the party making the statement cannot charge the other with negligence in believing the false statement or take any benefit from it." *Gilbey* v. *Hamlin,* 297 Ill. 258.

If this was a fair trade and there was no intention on the part of appellant to mislead or deceive appellees in any way as to the trade, we cannot understand why there was any reason for appellant to go to appellees' home on Sunday night, just after they had been to see the farm, and get them to sign a deed conveying their lots in Chicago to him as a part of the trade. Conceding that the testimony on his behalf is correct that the deed was then filled out with a description of the property, there is no reason shown on his part why the deed was not acknowledged until two days later. Moreover, we think the weight of the testimony and the circumstances shown in the record tend strongly to support the master's conclusion that the deed was never acknowledged before a notary; that Herpich was employed all day when the acknowledgment was supposed to have been made, and could not have been, as testified to by appellant and his witnesses, in the notary's office during office hours to acknowledge the deed. In saying this we are not overlooking the fact that this court has frequently decided that while between the immediate parties to the deed the acknowledgment may be impeached for fraud or imposition, yet the evidence, to warrant the cancellation or setting aside of a deed upon the ground that the acknowledgment was obtained through fraud, collusion or imposition, must be so complete and clear as to satisfy the court that the certificate is untrue and fraudulent; that when the certificate of the officer who took the acknowledgment is in proper form it will prevail over the unsupported testimony of the grantor that the same is false and forged. (*Fitzgerald* v. *Fitzgerald,* 100 Ill. 385; *Post* v. *First Nat. Bank,* 138 id. 559; *Russell* v. *Baptist Theological Union,* 73 id. 337.) The rule, under these authorities, is that the acknowledgment of a deed cannot be impeached for anything but fraud and can only be overcome by evidence clear and convincing beyond a reasonable doubt, and that the testimony of the grantor will not be sufficient, alone, or even with slight

corroboration, to overcome the acknowledgment of the offi-
cer. Having these authorities in mind, and following the
rule there laid down, we think the circumstances surround-
ing the purported taking of this acknowledgment and the
signing of the deed, with the testimony of both the appel-
lees, are of such a character, supported and corroborated by
such strong and convincing proof, that we can reach no
other conclusion than that reached by the master,—that
the deed as to this property was not acknowledged as testi-
fied to by witnesses for appellant,—and that therefore the
decree of the circuit court holding that the deed should be
set aside as fraudulent and void must be sustained.

Counsel for appellant also objects that the fees allowed
to the master in chancery are excessive and should be re-
duced. The provision of the Fees and Salaries act relat-
ing to this question provides that masters shall receive for
taking and reporting testimony under order of court fifteen
cents for every one hundred words, and also provides that
in all counties, since the law was amended in 1919, masters
may receive for examining questions in issue referred to
them and reporting conclusions thereon, such compensation
as the court may deem just. The court may also include
as a part of such master's fees a reasonable allowance, not
to exceed fifteen cents per one hundred words, for ste-
nographer's services where the master shall certify that a
stenographer was necessarily employed, and shall attach to
his report a certified copy of the testimony taken by such
stenographer. (Laws of 1919, p. 563.) In this case the
master asked and was allowed fees for 1945 folios of oral
and documentary evidence at fifteen cents per folio, $291.75,
and for the stenographer's fees, 1913 folios at fifteen cents
each, $286.95. No objection was made that the number
of words was not correctly counted, (a folio meaning in
this case one hundred words,) and it would appear that
the two charges are not in excess of the statutory fee. The
trial court also allowed the master for ten continuances,

being times when the cause was set for hearing and time reserved therefor, at $3 each, $30; also for preparing master's report and serving notice to file objections to same, six days of not less than seven hours each, $180; to hearing arguments prior to the preparation of report, and on objections filed to said report and considering and passing on the same, four and a half hours, $30, making a total of $811.20. Prior to the allowance of this bill the master had filed two bills in which he asked $50 per day for preparing and serving notice of the report, but the chancellor, after a hearing, fixed the per diem basis at $30, and his fees were allowed on that basis. This court held in *Klekamp* v. *Klekamp,* 275 Ill. 98, that $35 per diem was an excessive charge for a master's work; that "the master's position and responsibility are inferior to those of the chancellor and his per diem compensation should not, in any event, be equal to or exceed the compensation of the chancellor when reduced to a per diem basis." In *Fitchburg Co.* v. *Potter,* 211 Ill. 138, the court stated that masters in chancery hold their offices *cum onere* and cannot demand fees for such services, as only under the statute are they allowed to receive compensation, and are restricted to the fees specified in the statute when the fee is specified; that the amount to be allowed to a master for his per diem work cannot be based upon what masters usually and customarily charge, but rather should be fixed upon evidence heard before the chancellor on principle not inconsistent with natural justice; that it is for the courts to determine what fees, under the statute, the parties are required to pay the master for services where no fee is fixed by statute, and that the custom or usage which has grown up among masters need not necessarily control the decision of the court on the question of fees. The trial court in fixing the master's fees should base them on the actual number of days which might reasonably be given to the case in preparing a report, both as to familiarizing himself with the facts and the law, and the num-

ber of days allowed should not be so excessive as to render nugatory the restrictions as to the per diem allowance.

The questions in this case are largely those of fact, and while the case presents some legal questions of importance, we think the time principally required to make the report would be in the examination of the evidence. The master having heard the witnesses testify would be in possession of most of the facts at the end of the hearing, and would not be required to study the typewritten transcript of the testimony very long in order to know its purport, although he might be required to give it some study in preparing the statement of the case for presentation to the court.

The above conclusions render it unnecessary for us to consider or decide the several other questions raised in the briefs, including those as to the alleged defective preparation of the abstract by appellant and that the original report of the master is incorporated in the record and not a copy. *Beth Hamidrash* v. *Oakwoods Cemetery Ass'n,* 200 Ill. 480; *Field & Co.* v. *Nyman,* 285 id. 306.

The decree of the circuit court will be affirmed except as to the amount of the master's fees, and as to those fees the decree will be reversed and the case remanded to the trial court, with directions to give further consideration (taking such proof as found necessary) to the amount of time consumed and the proper charges for the various items in question, and to re-assess the master's fees in accordance with the views of this court as set forth in this opinion and in the various decisions cited herein. The appellant will pay all costs except one-sixth of the court costs in this court, which shall be paid by the appellee.

*Reversed in part and remanded.*