(No. 24410.—
Otto Kerner, Attorney General, Appellee, *vs.* Ida May Peterson *et al.*—(Ida May Peterson, Appellant.)

*Opinion filed December 22, 1937—Rehearing denied Feb. 9, 1938.*

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, and KARL C. WILLIAMS, (FLOYD E. THOMPSON, and HENRY J. BRANDT, of counsel,) for appellant.

OTTO KERNER, Attorney General, ROY F. HALL, and HALL & DUSHER, (TRUMAN A. SNELL, and WILLIAM G. WORTHY, of counsel,) for appellee.

Mr. CHIEF JUSTICE FARTHING delivered the opinion of the court:

This is an appeal by Ida May Peterson, individually and as executrix of and trustee under the will of her husband, Pehr August Peterson, from a decree of the circuit court of Winnebago county removing her as trustee and ordering her to account to her successor for property she claimed was given to her by her husband before his death and for property distributed to her after she renounced his will.

The testator died June 9, 1927. His will was admitted to record on September 8, 1927, and letters testamentary

were issued to appellant. The will was executed May 23, 1927, and consists of five paragraphs. The testator directed payment of his debts and then bequeathed $20,000, in cash, and the family automobile and household effects to his widow, Ida May Peterson. By the third paragraph he gave the residue of his estate to her in trust. He made eighteen individual bequests of $5000, each, to be paid by the trustee in semi-annual installments of $250. By item 19 of this paragraph he directed the trustee to set aside sufficient funds to pay the eighteen individual bequests, and then provided that $500,000, in cash or securities, be paid to the Board of Foreign Missions of Augustana Synod of St. Paul, Minnesota, giving the trustee power to determine when payment should be made. By item 20 the trustee was directed, if sufficient assets remained, to organize an Illinois corporation, not for profit, for the purpose of founding a home for the aged people of Swedish nationality or descent living east of the Rock river in Rockford. The trustee was to choose the name of the corporation and its board of trustees, and she was directed to pay over to its trustees $500,000, in cash or securities. She was also given authority to determine when this payment should be made. Item 21 provided that if sufficient funds remained after paying the preceding specific bequests, she should pay $500,000, in cash or securities, to the Young Men's Christian Association of Rockford. Item 22 provided that if any funds remained, the trustee should hold the residue as a charitable trust fund to be paid out by her, at such times and in such manner as she deemed best, to such charitable or religious organizations as she might select, provided that she should make full distribution of the charitable trust fund on or before ten years after the death of the testator. Item 23 empowered the trustee to make distribution of the trust fund "in moneys, securities or other property" and made her judgment as to what should constitute a just and proper division or apportionment among the beneficiaries, binding

and conclusive upon all parties. It also directed that the legacies were to be paid free and clear of inheritance or estate taxes. Item 24 gave the trustee full power and authority to manage the fund, and item 25 provided for the appointment of a succeessor trustee. The fourth paragraph of the will named Ida May Peterson as executrix, without bond, and with full power to do all things necessary for complete administration of the estate as fully as the testator could if he were living. The fifth paragraph stated that the provisions for the widow were to be in lieu of dower, widow's award and other interests in the estate, for the reason that testator had already conveyed a substantial portion of his estate to her.

On September 7, 1928, Ida May Peterson filed her written renunciation of the provisions of the will made for her. On June 21, 1929, she filed her final report as executrix, and on June 24, 1929, that report was approved and she was discharged.

On June 21, 1933, the Attorney General filed his complaint in the circuit court of Winnebago county against Ida May Peterson, individually and in her capacities as executrix and trustee, the Board of Foreign Missions of Augustana Synod of St. Paul, Minnesota, the Young Men's Christian Association of Rockford, Illinois, B. W. Flinn, and seventeen of the individual beneficiaries named in paragraph three of the will. By an amended and supplemental complaint the P. A. Peterson Home Association, an Illinois corporation not for profit, was added as a defendant. On the hearing, B. W. Flinn and the seventeen individual beneficiaries were dismissed.

The complaint charged that Ida May Peterson did not, in her final report as executrix, make any designation of the property to be used in carrying out the purposes of the will, and that there is no public document on file which indicates what designation has been made, if any, and what securities are available for carrying out the bequests; that

the trustee has never reported to any court the state of the trust accounts, but has handled the trust fund as if it were a private fund. The complaint alleged that when testator died the interest of Ida May Peterson was not antagonistic to the interests of the trusts created by the will, but that after she had renounced the will she had a personal interest in the estate antagonistic to the trusts created by the will, and, therefore, became incompetent to act as trustee. It was charged that the testator intended that the gifts made to his wife before his death should be in lieu of any other interest she might have in his estate, and that, in fairness to the trusts, she ought to have accepted the bequest made to her in the will, and the gifts theretofore made, in full of her interest in the estate; that, notwithstanding her duty to the trusts, she renounced the will and thereby reduced the amount of the estate available for the trusts; that although, under the statute, she may have had the right to renounce the will, she violated her duties as trustee by so renouncing, and became disqualified to continue acting as trustee. It was charged that Ida May Peterson acquired a large amount of testator's property after the making of the will and before his death, in addition to that referred to in the fifth paragraph of the will, and caused the estate to be depleted so that there was not enough property left to carry out the trusts. It was charged that B. W. Flinn had the books and records of the estate and conducted most of its business and was, in fact, trustee. It was charged that the trustee had refused a favorable cash offer for shares of stock in the Rockford Drop Forge Company and Rockford Life Insurance Company and she should be charged, on accounting, for the amount for which she could have sold the stock. The complaint was filed by the Attorney General on behalf of the persons who were to be benefited by the establishment of the home for aged persons under paragraph three of the will. The complaint asked that Ida May Peterson, as trustee, be required to account for cer-

tain items appearing in her final report as executrix, which it is claimed were properly chargeable to her as trustee. In her final report as executrix it appears that she paid over to herself, as trustee, the sum of $99,200 to assist in re-financing the Rockford Steel Furniture Company, but it is claimed she had no authority to use trust funds for that purpose, and it was asked that she be compelled to account for those funds. The complaint asked the trustee to account for certain securities of the United States government which she received under the order of the probate court. There was a general prayer for accounting and a prayer that she be removed as trustee because of her personal interest in the estate. The complaint prayed that she be compelled to make to the circuit court a complete statement of the assets of the estate at the testator's death, and as to what property was given to her as mentioned in the fifth paragraph of the will, and as to what she received after the will was made and before testator's death; it prayed that the court should specify the property applicable to the payment of each bequest, and particularly the bequest for the home for aged people of Swedish nationality or descent. The complaint also prayed that a new trustee be appointed, with sufficient bond to protect the trust fund, and that the new trustee be required to make semi-annual reports to the court. There was a prayer that Ida May Peterson be held personally liable for any money lost on account of the Rockford Steel Furniture Company transaction and for general relief. The demurrer of Ida May Peterson, as an individual and as executrix and trustee, was overruled, and she filed an answer in which she denied the parts of the complaint which charged her with misconduct and dereliction of duty. She averred that her final report as executrix showed, in detail, all amounts paid to her or for her, as trustee, and that the report, after due notice to all interested parties, was approved by the probate court and it cannot now be attacked in this collateral

proceeding. She charged that the Attorney General was advised of all the facts with respect to the administration of the estate by her, as executrix, during 1927, 1928 and 1929; that the gifts to her by her husband were brought directly to the attention of the Attorney General in the inheritance tax proceedings in 1927, and that the renunciation of the will was a matter of public record and was brought to the attention of the Attorney General in 1928. Appellant claimed that she had relied on the order of the probate court and paid out large sums of money for inheritance and income taxes and had irretrievably changed her position in reliance upon that order.

In September, 1935, Ida May Peterson filed her supplemental answer stating that, prior to the beginning of this suit, she had paid the current payments to the eighteen individual beneficiaries and had paid $50,000 to the Board of Foreign Missions on June 10, 1933. Later she paid the remainder of the bequest to the Board of Foreign Missions and received a receipt in full discharge of her liability on that bequest. On August 26, 1935, she organized the P. A. Peterson Home Association, and turned over to it cash, securities and property worth $500,000 and received a receipt in full payment of the bequest. She stated that she was then ready to turn over the balance of the trust fund, which was less than $500,000, to the Young Men's Christian Association.

B. W. Flinn, by his answer, denied that he had been appointed manager of the trust estate and claimed that he was employed by the trustee as an accountant, and had served in no other capacity. The Board of Foreign Missions filed its answer to the original complaint stating that the trustee had kept full, complete and accurate accounts, and that it knew of no violation of duty by the trustee.

On September 24, 1935, the complainant filed an amended and supplemental complaint claiming that the widow was estopped to renounce the will because she had accepted the

gifts made to her by her husband during his life time, and the benefits under the will. The additional relief sought was that the renunciation be declared as of no effect in so far as is necessary to make up any deficit in the fund distributable to the home for aged people. It was claimed that she could not renounce the will without first restoring to the estate the gifts referred to in the fifth paragraph of the will; that she accepted the bequest under the second paragraph of the will on March 22, 1928, and thereby confirmed the will and estopped herself to renounce. The complaint alleged she had no authority to organize the P. A. Peterson Home Association after this suit challenging her authority to act as trustee was filed, and it was charged that the directors of the P. A. Peterson Home Association have accepted money and property worth less than $500,000. Ida May Peterson's demurrer was overruled. The P. A. Peterson Home Association moved to dismiss both the original and amended and supplemental complaints on the grounds that the suit was prematurely instituted; that the complaints do not state a cause of action; that it is a legal entity capable and ready to defend the interests of the aged people of Swedish nationality or descent; that it has already received full payment of the bequest, and that the suit is not such that it should be prosecuted by the Attorney General. This motion was denied.

Ida May Peterson then answered the amended and supplemental complaint, denying that the effectiveness of her renunciation was in any way impaired by the provisions of the will creating the trusts. She stated that the trust created by the will did not come into actual existence until after the period of administration in probate, and that the property which passed to her, as trustee, was that distributed by the final order of the probate court entered June 24, 1929, which still remains in full force and effect. She denied that she was bound to restore to the estate the gifts made to her by her husband in his lifetime, as a condition

of her renunciation. She admitted that she paid to herself the $20,000 bequest on March 22, 1928, but denied that the acceptance of it estopped her to renounce the will. She did not then know of her right to renounce, or that accepting the benefits under the will would affect her right to renounce. At the time she accepted the bequest the estate owed her $31,143.66, and she claimed that no one was prejudiced by her acceptance of the bequest, since she charged herself with the amount so paid. She denied all acts of wrongdoing and claimed the protection of the final judgment of the probate court for all acts occurring before she began to act as trustee on April 12, 1929. The three beneficiaries of the $500,000 bequests in paragraph three of the will filed answers stating that they were satisfied with the conduct of Ida May Peterson, as trustee.

The cause was referred to a master in chancery who reported, after a lengthy hearing, recommending that the relief prayed for be granted in most respects. He held that Ida May Peterson was estopped to renounce the will of her husband and that she should account for all property received under the order of distribution of the probate court; that the final order of the probate court did not settle anything with respect to the administration of the trust, and that none of the causes of action were barred by lapse of time. He approved the organization of the P. A. Peterson Home Association, but found that the property turned over to it was not of the value of $500,000. He held that appellant should be continued as trustee, provided she complied with the decree to account. The master found that the gifts to Mrs. Peterson of Skandia Furniture Company stock and of a balance of $230,000 on the Hogland contract or of the stock of the National Lock Company delivered in payment thereof, and the cash withdrawn from testator's bank accounts shortly before his death, were not completed. He found that Mrs. Peterson had no right to make the adjustment that was made of the debts of the

Rockford Steel Furniture Company, and that she should account for estate moneys spent settling claims against the Rockford Steel Furniture Company which had been guaranteed by the testator.

The court entered a decree confirming the master's report except that it held that the gift of the Skandia Furniture Company stock had been completed. The decree also removed Mrs. Peterson as trustee and appointed a successor. The court held that appellant had no authority to surrender the collateral which had been deposited by F. G. Hogland to secure the last payment of $230,000 on his contract to buy stock of the National Lock Company from P. A. Peterson, and ordered her to deliver the collateral, or its value, to the successor trustee. She was also ordered to pay the successor trustee $20,800 cash which she had withdrawn from her husband's bank accounts shortly before his death. She was ordered to turn over to her successor in trust all the money, securities and property, appraised at $1,070,847.23, which she had received from the estate pursuant to the probate court's order of distribution, together with the income thereon. She was ordered to pay to her successor $62,300, less any amount she might be able to prove was a legitimate claim against the estate by reason of testator's guaranty of the Rockford Steel Furniture Company's debts. She was directed to repay $15,000, which she had received as her widow's award, and was ordered to convey to her successor all real estate held as trustee, and all real estate distributed to her by virtue of the renunciation, and to pay the costs of this suit. The decree found her to be the owner, by gift, of the Skandia Furniture Company stock, the Hess Brothers Store building, the A. Leath & Company stock, the Sundstrand Corporation stock, the D. R. Peterson notes, and the American Guaranty Company stock. The master was allowed a fee of $6000 for preparing his report and $500 for clerk hire. Ida May Peterson appeals from those parts of the

decree which find against her, and complainant appeals from all portions of the decree which confirm gifts to appellant, except the gift of the Hess Brothers Store building. None of the other parties have appealed.

The testator and Ida May Peterson were married April 8, 1903. He was then reestablishing himself in Rockford industries after his failure in the panic of the nineties. The estate which he left was accumulated by the joint efforts of Mr. and Mrs. Peterson. For many years after their marriage, appellant did her own housework and helped her husband by doing clerical work for him in the evenings. Mrs. Peterson took on more work as testator's interests increased. She signed checks, notes, and contracts, but always at his direction. About 1915, she began working in Hess Brothers Store, a Rockford department store in which Mr. Peterson was interested, and, about 1918, she took over its general supervision. In 1923, the last department of this store was sold to A. Leath and Company. The building which housed this enterprise was given to Mrs. Peterson by deed on April 5, 1927, and it is now conceded that this gift was valid.

The following are the facts with reference to the gifts of property claimed by appellant to have been made to her by testator before he died. Mr. Peterson gave appellant his stockholdings in the Skandia Furniture Company in 1918. This gift was made more than two years prior to testator's death and was not reported for inheritance tax purposes. Appellant testified that Peterson endorsed the certificates in blank and delivered them to her and told her they were her property. B. W. Flinn testified that, early in 1925, Peterson told him that this stock belonged to his wife, and that testator was once contemplating an exchange of this stock, but said that he could not exchange it because it belonged to his wife. Appellant sold some of this stock, on contract, in February, 1926, and payments were made to her from time to time prior to testator's death.

Appellant loaned this stock to her husband to pledge as collateral, and he continued acting as director in the company after the gift. The shares were transferred on the books of the company a few months before testator's death. Based upon this showing the master held that there was no valid gift, but the court sustained an exception to this finding and held the gift valid.

In 1923, A. Leath & Company purchased the Hess Brothers Store from Peterson and gave 616 shares of its preferred stock as part of the purchase price. Appellant testified that her husband endorsed the certificates and delivered them to her, and told her that she had earned this stock by her faithful service in the store. The assignment on the back of the certificates was dated October 1, 1926, and was witnessed by R. K. Welsh, who was Peterson's legal adviser, and who represented his estate after his death. These certificates were likewise often used by Peterson as collateral, and were not changed to her name on the books of the company until May 31, 1927, nine days before testator died. B. W. Flinn testified that Peterson told him in December, 1926, that he had given this stock to Mrs. Peterson. About the middle of May, 1927, Peterson directed that Mrs. Peterson send the certificates to Welsh and to have him attend to the matter of having them transferred to her name. No questions were raised in the inheritance tax proceedings, or in the administration of the estate, as to Mrs. Peterson's title to these shares of stock and the gift was held valid by the master and the court.

In December, 1926, Peterson sold his interests in the Sundstrand Adding Machine Company for $250,000 cash and 2000 shares of the preferred stock of that company. Mrs. Peterson wrote checks at his direction distributing the cash for deposit. Certificates representing 1748 shares were delivered upon completion of the sale, and Peterson turned these over to appellant and told her they belonged to

her. Flinn suggested that Peterson invest the cash realized from the sale of Sundstrand Adding Machine Company stock in government securities so that his widow would have liquid assets with which to pay death taxes and administration expenses in the event of his death. Peterson had apparently not considered the possibility that he would die and was shocked when Flinn told him that the aggregate taxes on his estate, in the event of his death, would be roughly $900,000. He then told Flinn that he had given appellant the preferred stock in the Sundstrand company. He also told Hugo Olson, who was interested with him in the company, that he had given the stock to appellant. In May, 1927, he directed appellant to endorse the certificates for him and to have them transferred on the books of the company. This gift was reported for inheritance tax purposes, because it was made within two years of testator's death, and no question was raised as to her title to the shares of stock. This gift was held valid by the master and chancellor.

D. R. Peterson had given to P. A. Peterson five notes dated November 12, 1926, aggregating $99,385. Mrs. Peterson testified that testator directed new notes to be made payable to her, and D. R. Peterson signed these new notes. B. W. Flinn testified that testator told him of giving these notes to appellant early in 1927. These notes were also reported in the inheritance tax proceedings and the Attorney General was fully advised of the circumstances concerning the gift. This gift was held valid by the master and the chancellor.

The testator was the owner of 11,798 shares of stock of the American Guaranty Company of Columbus, Ohio. He gave this stock to appellant early in 1927, and in March or April, 1927, he took the certificates with him to a board of directors' meeting in Columbus and had the stock transferred to appellant on the books of the company. The company paid the June, 1927, dividend to Mrs. Peterson.

This gift was also reported in the inheritance tax proceedings and was held valid by the master and the chancellor.

The last payment, amounting to $230,000, due on a contract with F. G. Hogland to purchase Peterson's National Lock Company stock was due May 25, 1927. Hogland had deposited collateral to secure payments under the contract. He paid the last installment on the contract to Mrs. Peterson by giving her certificates made out in her name for 2300 shares of "B" preferred stock of the National Lock Company and gave a receipt running to Mrs. Peterson for the collateral he had given to secure the contract. Flinn testified that when he was discussing death taxes with Peterson in December, 1926, and again in February, 1927, Peterson told him he had given Mrs. Peterson the last payment on the Hogland contract. Peterson told his wife to accept the preferred stock in lieu of cash when the last payment was due. This gift was also reported in the inheritance tax proceedings. The master and chancellor held this gift invalid, and ordered appellant to return the collateral, or its value, to the estate. Appellant says there is neither allegation nor prayer to support a decree ordering the return of the deposited collateral.

Mrs. Peterson testified that on May 24, 1927, the day following the execution of the will, testator told her to draw checks on his bank accounts to pay the $45,000 mortgage on the Hess Brothers Store building, because he wanted her to have that building free and clear of the mortgage. She accordingly wrote six checks totalling $18,000 which she showed to her husband. She then cashed them and showed him the money she had withdrawn. She retained the money until testator died, and then used it to pay on the mortgage. She was able to produce only five of the six cancelled checks at the hearing held in 1935. She was ordered to account for $20,800 by the decree. There is a dispute as to whether the missing check was for $1000 or $3800, but appellant denied that she drew a check for the

larger amount on May 24, 1927. This gift was reported at the proceedings to fix the inheritance tax and was not questioned there. It is claimed that Peterson's mental condition on May 24, 1927, rendered him incompetent to make a gift. On May 23 he had executed the will which was admitted to record and had been active about his various business affairs on May 20, 1927, and we are of the opinion that the greater weight of the evidence shows that he was mentally competent to make a gift on May 24, 1927.

The facts of the Rockford Steel Furniture Company transaction, concerning which the court ordered the trustee to account for money paid to settle claims against the estate on guaranties signed by the testator, need not be stated. It suffices to say that the settlement of this claim was within the jurisdiction of the probate court, (*Trego* v. *Estate of Cunningham,* 267 Ill. 367, 374,) and its order approving the settlement was never appealed from, but is still in full force and effect. It effectively discharged the executrix from all liability thereon.

The questions raised as to the validity of the gifts from the testator to the appellant, both before and after making his will, are raised both on the appeal and cross-appeal, and the gifts may all be considered together. The testimony of appellant as to the circumstances of the various gifts is undisputed. She was examined by counsel for appellee under section 60 of the Civil Practice act and related the facts stated above with reference to the gifts of stock to her. She is corroborated by other witnesses. Peterson began giving away his property in the early months of 1927 so that his estate would escape a huge liability for estate and death taxes. There is nothing to disprove appellant's testimony as to the various gifts. They were complete when the property, or evidence of title to it, was delivered to her with intent to pass title. (*Northern Trust Co.* v. *Swartz,* 309 Ill. 586, 598.) The admissions of the testator that his wife was the owner, and the circumstance of her

possession of the property and money that was the subject of the gifts, also tended to establish her ownership. (*Martin* v. *Martin,* 174 Ill. 371, 378.) There is no presumption of undue influence where the gift is from husband to wife, and courts of equity will uphold gifts to a person who has a natural claim on the donor, unless strong evidence impels the opposite conclusion. (*White* v. *Willard,* 232 Ill. 464.) The master's finding was approved by the chancellor and the gift of the last payment on the Hogland contract amounting to $230,000, and the gift of cash amounting either to $18,000 or $20,800, were held invalid. While the chancellor's findings are entitled to great weight, we see no distinction between the gifts held valid and those held invalid, and we are of the opinion that all of the gifts should have been upheld. This holding disposes of the cross-appeal. It also makes unnecessary a discussion of appellant's contentions that the order of the probate court finally settled Mrs. Peterson's title to this property by approving the inventory she filed as executrix, and that this attempt to have the gifts declared invalid is barred by *laches* and the Statute of Limitations.

The court erred in holding that the property turned over to the P. A. Peterson Home was not worth $500,000. The original report of the master found that the home was organized in accordance with the will; that the board of trustees selected by Mrs. Peterson were persons of good character and broad experience, and that the acceptance of the payment by the home in full satisfaction of the bequest was proper. On objection of appellee, he modified his finding and found that the property received by the home was not worth the value placed upon it by appellant. The trustees for the P. A. Peterson Home are not objecting that the property received by them was not worth the value of $500,000 placed upon it by appellant, and there is no competent evidence to show that appellant placed a grossly excessive value upon the property turned over to the home.

She was given authority, under the will, to value the property, and in pursuance of this authority she turned over $200,000 cash, and securities and real estate which were valued at $300,000. The stocks were in Rockford industries and were unlisted. Necessarily there would be a wide difference in opinion as to their value. There was abundant proof that they were reasonably worth the value placed on them by the trustee.

The principal controversy in this case concerns the circuit court's holding that appellant was estopped to renounce the will by reason of her having qualified as executrix, accepted payment of the legacy under the will, and having acted as trustee under the testamentary trust. Appellant contends, first, that the probate court of Winnebago county had exclusive jurisdiction to admit the will to probate, to pass upon the completeness of the inventory, to administer the estate, to approve the report of the executrix, to approve the renunciation by the widow, to make distribution to those entitled to share in the estate, and that the orders of the probate court are final and cannot be collaterally attacked by this proceeding in the circuit court. She also insists that, even if the question of renunciation may be inquired into in this proceeding, she was not estopped to renounce the will.

The probate court has jurisdiction to administer the estate of deceased persons. It may, in its discretion, disregard the renunciation made by a conservator of an insane widow (*Sippel v. Wolff,* 333 Ill. 284) or appoint a guardian *ad litem* and direct him to renounce on behalf of an insane spouse. (*Davis v. Mather,* 309 Ill. 284.) Under its equitable powers it may settle a claim for contribution against the estate of a deceased surety. (*Trego v. Estate of Cunningham, supra.*) It has power to construe a will and determine the rights of legatees thereunder. (*Strawn v. Trustees of Jacksonville Female Academy,* 240 Ill. 111.) It may determine whether property claimed by the admin-

istrator, individually, belongs to the estate. (*Duval* v. *Duval*, 153 Ill. 49; *Martin* v. *Martin*, 170 id. 18.) In *Davis* v. *Mather, supra,* in deciding that the probate court could direct the next friend of a surviving, insane husband to renounce the provisions of a will made for his benefit, we said: "It seems clear that the statute has conferred upon the probate court equitable powers concerning questions arising out of the renunciation of the provisions of a will. While probate courts are not courts of general chancery jurisdiction and possess only such chancery powers as are conferred by statute, (*Hannah* v. *Meinshausen,* 299 Ill. 525,) the statute on dower concerning an election in this character of cases, and section 79 of the Administration act, confer on the probate court equitable powers concerning renunciation of a will, and questions arising therefrom, as the administration of the estate. (*Sebree* v. *Sebree,* 293 Ill. 228.) It follows that probate courts have jurisdiction of the subject matter of such renunciation."

In *Strawn* v. *Trustees of Jacksonville Female Academy, supra,* in deciding that the circuit court had no jurisdiction of a bill to construe a will under the facts presented in that case, we said, (page 117,): "The probate court in which the estate is being administered is by the 116th section of the chapter on administration of estates given power and authority to order and direct the payment of legacies mentioned in the will, and this includes the power to determine the legal right of the trustees of the Jacksonville Female Academy to the $10,000. The executors are not authorized to pay it to the trustees without the order of the probate court, and by section 119 it is provided that a legatee can not maintain an action against an executor for the payment of a legacy until the probate court shall have ordered it to be paid. Any order made by the probate court, in the exercise of its jurisdiction, as to ordering the payment of legacies may be appealed from by the party aggrieved, but unless so appealed from is valid and binding upon the parties and

a protection to the executors. In Page on Wills the author says, (sec. 807,) where a statute gives probate courts authority to direct the payment of legacies such courts may construe wills in so far as is necessary to direct the payment of legacies. 'A court of chancery will not exercise jurisdiction over the administration of estates except in extraordinary cases. Some special reason must be shown why the administration should be taken from the probate court.' "

In *Teater* v. *Salander,* 305 Ill. 17, we held that the circuit court had no jurisdiction, in a collateral proceeding, either to determine what property should be inventoried or what distribution should be made of the property of the deceased. Those were matters amply provided for by the law relating to the administration of estates. Section 112 of the Administration act provides that in all cases where a hearing has been had in open court upon any final report of an executor or administrator upon notice as hereinbefore provided, all parties in interest shall be bound by the order of the court in relation to such report, in the absence of fraud, accident or mistake.

The final order of the probate court entered in this estate on June 24, 1929, recited that due and proper notice of the filing of the final report and petition for discharge of the executrix had been given all interested parties. It is not alleged or proved that due notice was not given, and so it is conclusively presumed that every person entitled to notice was given notice. *Denk* v. *Fiel,* 249 Ill. 424; *Bradley* v. *Drone,* 187 Ill. 175.

It is clear, from the authorities, that the subject matter of the renunciation was within the jurisdiction of the probate court; that it exercised that jurisdiction and permitted appellant to renounce. The order of the probate court was entered after giving due notice, and has never been appealed from. It is not open to collateral attack in this proceeding to remove appellant as trustee.

Appellant was not estopped to renounce the will by the fact that she qualified as executrix, accepted payment of the legacy, and acted as trustee of the testamentary trust. In *Ward* v. *Ward,* 134 Ill. 417, the facts were similar to those in the case at bar. There the widow executed a written election to take under the will one day after the will was admitted to probate. She received all of the articles of personal property bequeathed to her. She divided the house and the garden and took possession of one-half of them, and received the produce of the lands as provided by the will. She was then allowed to renounce the will. We noted that the value of property taken by her was less than that to which she was entitled, and said that the term "election" implies a choice between different things, and it is therefore impossible that there can be an election where the will gives only that which, without it, passed by operation of law to the party. In this case the widow upon the advice of the attorney for the estate paid herself the $20,000 legacy and took possession of the household goods and automobile given her under the will. The evidence is contradictory as to when she was fully advised of her right to renounce. She claimed that she did not learn of this right until shortly before the year was up, when Mrs. Tiffany of Freeport, a member of the bar, told her she could renounce. She then consulted the attorney for the estate about renouncing the will, and he told her that, because he represented the estate, he could not discuss the subject with her. She then procured Mr. Tiffany, who was also an attorney, to file the written renunciation of the will on September 7, 1928. The attorney for the estate testified that he advised appellant that she could renounce the will in March, 1928. He did not claim that he advised her that the acceptance of the bequests under the will would estop her from renouncing the will. Mrs. Peterson insists she did not talk with the attorney for the estate about renouncing the will until July, 1928, and in this she is ap-

parently corroborated by a letter dated July 18, 1928, from the attorney for the estate, in which he advised her that the year during which she could renounce the will would soon expire, and advised her to determine if she intended to renounce. Appellee insists that the proof shows that Mrs. Tiffany first talked to appellant shortly after Peterson's death, because there is some testimony that appellant was crying at the time Mrs. Tiffany visited her. In her final report appellant credited the estate with the $20,000 paid her on the bequest. She was entitled to much more than that on account of money she had advanced and we are unable to see wherein the estate or the beneficiaries of the trust were in any way harmed. Appellee claims that appellant was guilty of concealing from the probate court the fact that she had accepted the bequest, because she stated in her report that the $20,000 had been paid to herself on account of her statutory share. Under the circumstances it was immaterial whether the probate court knew or did not know that she had intended to receive the $20,000 in payment of the bequest to her under the will. It makes no difference whether the widow was fully advised as to her right to renounce the will at the time she accepted the bequest, for there is no element of estoppel in the case. No one had changed his position in reliance upon her acceptance of the bequest, and no one was harmed as long as she did not get more from the estate than that to which she was legally entitled after the renunciation. It is well known that a widow has a year in which to renounce her husband's will, and there is nothing in our statute to deprive her of this right. She is entitled to the twelve months allowed her by statute in which to renounce. (*Lipscomb* v. *Allen*, 298 Ill. 537, 547; *Williams* v. *Williams*, 161 Ky. 55.) The statute is designed to confer privileges upon widows and to prevent impositions upon them through their ignorance of the law or the promptings of impulsive affection. (*Bretz* v. *Matney*, 60 Mo. 444.) The acceptance of

an appointment as executrix of her deceased husband's will, without bond, did not create an estoppel against her, (*Pace* v. *Pace,* 271 Ill. 114,) and, by the same reasoning, the acceptance of a trusteeship under a trust created by the will did not estop appellant from renouncing the will, where it was not shown that any one had changed his position to his detriment. We hold that appellant was not estopped to renounce her husband's will, and the chancellor erred in so holding.

Appellant has argued two points in her brief which we will not consider. She urges that she should have been allowed a change of venue, and that the Attorney General has wrongfully allowed private persons to prosecute this suit in his name. She, nevertheless, asks that we consider the case on the merits. This amounts to a waiver of both points, because if either were well taken a consideration of the merits would be unnecessary.

Appellant contends the costs of this suit should not have been taxed against her, individually. There is an absence of proof showing that the trustee was guilty of any misconduct. She, at all times, acted upon advice of counsel and in pursuance of orders of the probate court, and was diligent in her duties both as executrix and trustee. This suit was largely an attempt to re-litigate matters already decided by the probate court and it would be manifestly unjust to compel her to pay out of her personal funds the costs of such a suit. It is the rule that a trustee not at fault is entitled to be reimbursed for all expenses properly incurred in the administration of the trust and has an equitable lien on the trust estate for such expenses. (*Patterson* v. *Northern Trust Co.* 286 Ill. 564.) Appellant's contention must be sustained.

Appellant contends that $6000 is an excessive allowance to the master for hearing arguments, examining abstracts of record, written briefs and arguments and all other ques-

tions in issue, and reporting his conclusions. The master was allowed $500 for clerk hire, and $875 for taking and reporting testimony. The master certified that he devoted seventy-five days to a consideration of the case. The master's position and responsibility are inferior to those of the chancellor and his daily compensation should not be equal to or exceed the chancellor's compensation when reduced to a *per diem* basis. (*Klekamp* v. *Klekamp,* 275 Ill. 98.) The chancellor, in fixing the master's fees, should determine the actual number of days reasonably necessary for the master to prepare a report and familiarize himself with the facts and the law, and the number of days allowed should not be so excessive as to render nugatory the restrictions on the *per diem* allowance. (*Herpich* v. *Williams,* 300 Ill. 540.) A consideration of this case should not require seventy-five days. The record consists of approximately 2500 pages and the briefs and arguments filed by the parties in this court total 484 pages, and appellant says that she furnished the master with briefs and arguments almost identical with those furnished this court. The compensation was determined at the rate of $80 per day, which is far in excess of the chancellor's salary figured on a *per diem* basis. The master's fees were grossly excessive.

The decree of the circuit court will be reversed and the cause remanded, with directions to give further consideration (taking such proof as may be necessary) to the amount of time consumed and the daily rate of compensation that would be reasonable for a consideration of this case, and to re-assess the master's fees. The amended and supplemental complaint should then be dismissed for want of equity.          *Reversed and remanded, with directions.*