E. K. Buck Retail Stores, a corporation, et al.,
appellees, v. Walter E. Harkert et al., appellants.
62 N. W. 2d 288

Filed January 15, 1954. No. 33356.

*Hotz & Hotz, Robert M. Kane,* and *William F. Dalton,* for appellants.

*Kennedy, Holland, DeLacy & Svoboda,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is a suit for a declaratory judgment brought by E. K. Buck Retail Stores, a corporation, and Earl K. Buck against Walter E. Harkert and Mercedes C. Harkert, and Harkert Houses, a corporation, to test the validity of a corporation control agreement entered into by the parties in their capacities as stockholders in Harkert Houses. The trial court disposed of the issues raised by holding two separate trials and entering two decrees. The first decree was entered on October 29, 1951, in which it was determined that the agreement was in all respects valid, the defendants Harkert were restrained from violating said agreement, the defendants Harkert were ordered to perform in accordance with the terms of the agreement, the prayer of the plaintiffs for a declaration that the corporate election of January 16, 1950, was invalid was denied, and all claims of the defendants, including those for damages, were denied. A second agreement between the parties bearing date of July 7, 1938, similar in nature, was also held valid. The court granted permission to plaintiffs to seek further relief in damages based on the judgment and decree, and retained jurisdiction of the case for this purpose. The second decree was entered on January 14, 1953, in which it

was determined that plaintiffs were entitled to judgment against the defendants Harkert in the amount of $33,612 and that defendants' motions for judgment notwithstanding the findings of the court should be overruled. On February 3, 1953, all motions for a new trial were severally overruled. This was a final order as to the decree of October 29, 1951, and that of January 14, 1953. The defendants Harkert have appealed from this order. In order to simplify the disposition of the issues we shall deal first with those involved in the first trial which resulted in the decree of October 29, 1951.

The record shows that Walter E. Harkert, hereafter referred to as Harkert, was on and before the latter part of 1937 the sole owner of a chain of restaurants or hamburger stands. His finances became impaired in the period prior thereto to the extent that he was compelled to seek financial aid from sources other than banking institutions. He engaged in a plan of selling the fixtures and equipment at a designated eating house or stand to the investor for cash and entering into an agreement to buy the fixtures and equipment back at the end of 5 years for a higher price, payment to be made in monthly installments over the 5-year period. Several of these sale and repurchase agreements had been entered into before Harkert became acquainted with Earl K. Buck, hereafter referred to as Buck. Harkert and Buck became acquainted, with the result that Buck entered into four purchase and resale agreements with Harkert prior to the incorporation of the Harkert restaurants. In the latter part of 1937 Harkert was desirous of improving his financial structure, and broached the subject to Buck. Buck advised Harkert to consult with Buck's lawyer with reference to the matter. The incorporation of the Harkert interests under the name of Harkert Houses resulted, undoubtedly with the expectation that Buck would be interested in advancing more money in the furtherance of his interests and those of the new corporation. An auditor calculated the net

worth of the business at this time to be $47,504.38. This figure was admittedly arrived at by not treating the payments on repurchase agreements, which became due more than 1 year thereafter, as a liability in his calculation of the net worth of Harkert. These deferred payments amounted to $41,042 and, if deducted as a liability, would have fixed Harkert's net worth at $6,462.38, exclusive of good will and the value of the business as a going concern. All of this Buck knew and no contention is made that he was misled thereby.

From this point on we shall refer to the E. K. Buck Retail Stores, Buck, and Devor, as Buck, their interests being identical so far as this litigation is concerned. The evidence shows that Harkert at this time was obligated on repurchase agreements and other forms of indebtedness in the sum of $44,750 to persons other than Buck. Harkert was indebted to Buck in the gross face amount of $55,650. An agreement was made whereby Buck would cancel this gross amount of $55,650 and pay $53,625 in cash into the business for which he was to receive as a consideration therefor 40 percent of the stock of Harkert Houses and equal representation on the board of directors of the corporation. Figuring the gross amount of the indebtedness of Harkert to Buck at its then present value, it appears that Buck actually invested a total of $90,725 in Harkert Houses. The evidence shows that Buck paid in the $53,625, $44,750 of which was used to pay the assumed obligations of Harkert by Harkert Houses, and $8,875 was paid to Harkert as a part of the stock transaction, all with the full knowledge of Buck.

As hereinbefore indicated, Buck and those for whom he acted were to receive 40 percent of the stock of the company and equal control on the board of directors of the Harkert Houses. The pertinent part of the contract so providing states: "That the number of the members of the Board of Directors of Harkert Houses be reduced from five, as it now is, to the number of four,

and that the said four members of the new Board shall consist of said Walter E. Harkert, Mercedes C. Harkert, his wife, Earl K. Buck and Rodney B. Devor, and that the number of members of said Board of Directors shall be maintained at four in number, of which at all times two thereof shall be such persons as shall be nominated or designated by the said Walter E. Harkert or his heirs, representatives or legatees, and the other two thereof shall be such persons as shall be nominated or designated by the said party of the second part. And it is further mutually agreed between the parties that at all stockholders' meetings of the said Harkert Houses held for the purpose of election of directors or director (in case of vacancy on the Board of Directors), that all of the said shares of stock of parties of the first part and also of party of the second part and also any additional shares of stock of the Harkert Houses which may be subsequently acquired by the said parties or either of them, shall be voted in such manner and for such person or persons as will keep and maintain the Board of Directors four in number, of which two thereof shall be such persons as shall be nominated or designated by said Walter E. Harkert or his heirs, representatives or legatees, and two thereof shall be such persons as shall be nominated or designated by the said party of the second part."

It is contended by the defendants that the foregoing portion of the agreement violates Article XII, section 5, of the Constitution, and section 21-135, R. S. 1943, and, in addition thereto, contravenes the public policy of the state and is void for that reason. It will be noted that the statute was enacted pursuant to the mentioned constitutional provision and that the two are similar insofar as their substance is concerned. They will therefore be considered together.

The pertinent part of Article XII, section 5, of the Constitution, is as follows: "The Legislature shall provide by law that in all elections for directors or managers

of incorporated companies every stockholder shall have the right to vote in person or proxy for the number of shares owned by him, for as many persons as there are directors or managers to be elected or to cumulate said shares and give one candidate as many votes as the number of directors multiplied by the number of his shares shall equal, or to distribute them upon the same principle among as many candidates as he shall think fit, and such directors or managers shall not be elected in any other manner; * * *."

The contract here involved was entered into on May 23, 1938, by Walter E. Harkert and Mercedes C. Harkert as parties of the first part and the E. K. Buck Retail Stores as the party of the second part. On the date of the agreement Harkert was the owner of 2,637 shares of stock in Harkert Houses and Mercedes C. Harkert was the owner of 300 shares. The E. K. Buck Retail Stores became the owner of 1,198 shares on the day the contract was made and Buck and Rodney P. Devor became the owners of one share each. Harkert retained 1,437 shares and Mercedes C. Harkert retained 300 shares. There were a number of shares of stock held by persons not signatory to the agreement after the completion of the stock transaction. The contract was between the parties as stockholders. They involved no action on the part of the corporation. So far as the record shows, the board of directors, officers, or stockholders as such had no knowledge of the transaction. The E. K. Buck Retail Stores was a corporation operating a chain of shoe stores and was not, consequently, a competitor of Harkert Houses in the restaurant business.

In considering the meaning of Article XII, section 5, of the Constitution, and section 21-135, R. S. 1943, it is proper to consider the evil and mischief attempted to be remedied, the objects sought to be accomplished, the scope of the remedy its terms apply, and give it such an interpretation as appears best calculated to effectuate the design of the constitutional and legislative provi-

sions. It is clear to us that the purpose of the constitutional provision and statute enacted pursuant thereto was to provide for cumulative voting in the election of directors or managers of incorporated companies in order to secure to minority stockholders a greater representation in the management of the corporation's business. In order to do this it was necessary that the law state the number of votes to which each stockholder was entitled and to insure against an involuntary loss of the right conferred. In the accomplishment of the latter, the Constitution provides that "such directors or managers shall not be elected in any other manner." The latter prohibition, as we view it, operates to prevent a corporation by its articles of incorporation, by-laws, or any act of its directors or stockholders from depriving a stockholder of the right to vote his stock in the manner specified in the Constitution and statute. But such provision does not purport to limit the right of the stockholder to contract with reference to his stock. It grants him a right or privilege which he may or may not exercise as he sees fit, but it is one of which the corporation or any agency thereof cannot deprive him. Neither the constitutional provision nor the statute purports to limit the right of the stockholder to contract with other stockholders with respect to such right. The nature of the right granted by the Constitution and statute appears to have been concisely stated in Tomlin v. The Farmers & Merchants Bank, 52 Mo. App. 430, wherein the court said: "The right is one guaranteed by the law, constitutional and statutory, it is personal to the stockholder, it can be exercised or not by such stockholder as he may himself elect. * * * It, therefore, cannot be taken from him by a resolution or by-law adopted by a majority of shareholders."

In State ex rel. Frank v. Swanger, 190 Mo. 561, 89 S. W. 872, 2 L. R. A. N. S. 121, the court in dealing with a similar provision said: "The object and purposes of this provision in our Constitution is well understood

.and has been judicially expounded on several occasions. Its purpose was to introduce the principle of cumulative system of voting in elections of stockholders so as to secure to the minority of stockholders a voice in the management of the affairs of the company in proportion to the number of their shares, * * *. A construction has nowhere been given to section 6 of article 12, within our knowledge or research, so as to constitute it a prohibition or restriction on the right of stockholders to make their contracts which violate no rule of the common law and which affect no rights except their own."

The result necessarily hinges upon the meaning to be given to the words "and such directors or managers shall not be elected in any other manner." It will be noted that Article XII, section 5, of the Constitution, provides that every stockholder shall have the right to vote in person or proxy for directors or managers on a stock ownership basis for as many as there are directors to be elected, and he may cumulate his vote and distribute it among the candidates as he sees fit. Then follows the provision that directors shall be elected in no other manner.

We think the meaning of the constitutional provision is clear. Its purpose is to provide for cumulative voting in the accomplishment of which it was necessary to fix the voting power of the shares of stock. In many states cumulative voting is permissive,—it could be properly included in the articles of incorporation, or not, as the incorporators might determine. The clause "and such directors or managers shall not be elected in any other manner" was placed in Article XII, section 5, of the Constitution, to make it mandatory that every corporation within the purview of the constitutional provision should permit cumulative voting.

It is contended that the provision intended much more than that from its plain, unambiguous language, that it meant also that any agreement between stockholders,.

even though accompanied by a valuable consideration, was voided by the provision that such directors shall not be elected in any other manner. We point out that the elections of directors after the agreement of May 23, 1938, were held in accordance with the method prescribed in Article XII, section 5, of the Constitution. For that matter, the elections held after the breach of the agreement likewise were held in the manner prescribed. It will be noted that each share of stock was given one vote, the right to cumulate was not denied and, for aught the record shows, the voting power of the stock was in no way reduced. It is asserted, however, that an agreement between stockholders as to how stock shall be voted at the election of directors ipso facto changes the manner of election prescribed by the Constitution. To so hold would have the effect of invalidating existing statutes relating to voting trusts and all other forms of voting combines by a majority of the stock to control the management of the corporation, which were recognized at common law. The Constitution so construed would be superior to any statute in conflict therewith. We do not think the framers of the Constitution had any such intention and, if they had, adequate language could easily have been found to have expressly so provided. It was clearly the purpose of Article XII, section 5, of the Constitution, to secure to minority stockholders a voice in the management of the affairs of the corporation in proportion to the number of their shares. We can find nothing in this section which purports to change the then existing rights of a stockholder to contract with another stockholder with reference to how he should vote his stock.

Elaborate briefs have been filed by the parties dealing with the issues in this case. To discuss all of the cases cited and the distinctions drawn by the parties would unduly extend this opinion. On the constitutional issue, however, the defendants rely mainly upon two cases upon which we will venture to comment. These

cases are People ex rel. Arkansas Valley Sugar Beet & Irrigated Land Co. v. Burke, 72 Colo. 486, 212 P. 837, 30 A. L. R. 1085, and Brooks v. State ex rel. Richards, 3 Boyce (Del.) 1, 79 A. 790.

In the Burke case it appears that the water storage company, desiring to build an irrigating and storage system of its own, entered into an agreement with the receiver of the old canal company for the joint use of a part of its existing canal. A new canal company was organized and the old canal company stockholders were to receive stock in the new company. For the purpose of giving representation to the storage company, in the problems involved in maintaining and operating that part of the canal jointly used, the contract for the joint use of the canal provided also that the stockholders of the new canal company would annually vote for and elect as two of its five directors two stockholders of their own number to be designated by the storage company. The two corporations were rival and competitive companies whose rights and interests were antagonistic and adverse to the rights and interests of their own corporation. The right of the storage company was not contingent on its being a stockholder. It appears plain to us that the receiver was acting for the corporation and all of the stockholders thereof. If this be true, the provision for the election of the two stockholders nominated by the storage company to be directors constituted a corporate limitation on the power of stockholders to vote cumulatively or otherwise for all directors to be elected. Such a holding would, of course, be in line with our interpretation of Article XII, section 5, of the Nebraska Constitution,—the constitutional provision of the Colorado Constitution being identical with ours for all practical purposes. In the decision, however, the Colorado court went further and held that the words "And such directors, trustees or managers shall not be elected in any other way" meant more than the establishment of a cumulative method of voting. The court said: "The

language is plain and unambiguous. It is not susceptible of construction. It interprets itself.' It is an absolute, unequivocal command that the directors shall not be elected in any other way than the way or ways which the section itself specifically provides. The sentence was not intended to establish cumulative voting. That ·object had·been accomplished by previous provisions of the section. The inhibition is no more applicable or appropriate to cumulative voting than to voting by a stockholder of all his shares for as many directors as are to be elected. That is, two methods of voting—cumulative and non-cumulative—are provided, and the nominating and electing by either method is the same." The court held the contract void on its face for the reasons set out in the opinion at considerable length. The court did not say, as the defendants here contend, that all agreements between stockholders relating to the voting of stock were void. It did say: "Such being our conclusion, it is unnecessary to determine whether all separations of voting power from beneficial ownership, all irrevocable powers of attorney for the voting of the stock, or all voting trust agreements, are invalid." We think that the Colorado court meant that the canal company violated the constitutional provision when it attempted to limit the right of its stockholders to elect its directors, by the cumulative method or otherwise, when it contracted with reference thereto with the storage company in the manner in which it did. But it was not a case where two stockholders contracted for a consideration with reference to the voting of their stock. If the holding of the Colorado court has the effect that the defendants claim for it, we have no hesitancy in saying that it is not sustained by the better reasoning.

In the Brooks case the Delaware court was called upon to determine the right of the owners of preferred shares of stock to vote at the election of directors. The constitutional provision was similar to Article XII, section 5, of the Nebraska Constitution. The articles of incor-

poration of the company involved purported to deprive the owners of preferred stock of the right to vote for directors. A statute enacted subsequent to the adoption of the constitutional provision authorized such a provision in the articles of incorporation. The court held that the holders of the preferred stock were entitled to vote their stock under the constitutional provision. It will be noted that the prohibition of the constitutional provision operated against the corporation providing restrictive methods of electing directors. We find nothing in the opinion touching upon the right of stockholders to contract with each other with reference to how they will vote their stock. We think the defendants claim too much for the Burke and Brooks cases.

It is next contended that the agreement of May 23, 1938, was void as being against public policy. It is claimed that the public policy of this state is derived from Article XII, section 5, of the Constitution, and the implementing statute to which we have referred. Our discussion of the validity of the agreement as the constitutional provision relates to it tends to dissolve this issue. If, as we have said, control agreements between stockholders are not ipso facto void because of the constitutional provision, certainly no public policy can be gleaned therefrom which would void the agreement. No other source of public policy is asserted other than the constitutional provision and the implementing statute. We desire to make it clear, however, that in holding that the constitutional provision does not of itself void stock control agreements between stockholders, it does not mean that all such agreements are valid. The validity of the contract under the law, after determining the irrelevancy of the constitutional provision, will be subsequently dealt with herein.

Under the statutory law of this state, a corporation is to be managed by a board of directors elected by the stockholders. § 21-111, R. S. 1943. The contract here involved does not violate that provision. The stock-

holders elect the directors by the terms of the contract, and the power of the directors to manage Harkert Houses is not infringed. "It is not in violation of any rule or principle of law nor contrary to public policy for stockholders who own a majority of the stock of a corporation to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation, and it is not against public policy or unlawful per se for stockholders to agree or combine for the election of directors or other officers, so as to secure or retain control of the corporation, at least where the object is to carry out a particular policy with a view to promote the best interests of all of the stockholders, and the agreement is fair to all the stockholders alike, and to the corporation. It is 'the general inherent right, resulting from the ownership of stock in a corporation, to exercise the elective power such ownership confers, and to exercise it wisely or unwisely, alone, or pursuant to an agreement with other stockholders.' * * * Accordingly, it has been held that stockholders who own a majority of the stock of a corporation may elect themselves directors or appoint themselves its agents, or form and carry into effect policies of management as freely as if the business were their own, and so long as they act honestly, and do not devote the corporate assets or business to their own private gain or to the prejudice of other stockholders, no one can question their acts, which are purely intra vires. * * * If a control and voting agreement among stockholders aims at security of control without fraud on the corporation or others and does not sever stock ownership from stock control, it is not illegal. * * * In like manner a contract by the owners of more than one-half of the shares of stock of a corporation to elect the directors of the corporation so as to secure the management of its property, to ballot among themselves for directors and officers if they could not agree, to cast their vote as a unit as the majority should decide, so as to control the election, and

not to buy or sell stock except for their joint benefit, is not dishonest, violative of the rights of others, or in contravention of public policy, so long as no fraud is committed or wrong done to other stockholders. * * * Hostility towards such agreements and combinations seems to be lessening, or perhaps is becoming more discriminating between good and bad ends. Such agreements are distinct from voting trusts, and are not controlled by the same principles. The stockholders necessarily combine in the majority which passes the vote, whether they do so by previous agreement or not; and doing it by previous agreement is not of itself invalid. According to the weight of authority, the validity and legality of such combinations and agreements depend rather upon the objects thereby sought to be attained and the acts which are done under them, and the other circumstances, and an agreement may be a valid control agreement but invalid because of some other cause or effect. * * * The consideration for a voting agreement may consist in the purchase of stock on the faith of the promise of others to enter into the agreement." 5 Fletcher, Cyclopedia Corporations, § 2064, p. 249. This, we think, states the general law dealing with the subject of stockholders control agreements.

The evidence discloses that prior to the agreement of May 23, 1938, the defendants Harkert were financially involved to the extent that financial assistance was desired, if not necessary. Harkert had sold all of his restaurants for cash and taken back repurchase agreements calling for large monthly payments over a 5-year period. There were other obligations that had to be met. He approached Buck for the purpose of interesting him in providing fresh money for the business. Buck demanded that Harkert's business be incorporated as one condition precedent to financial aid by him. The business was incorporated and the issuance of 4,000 shares of stock at the par value of $100 per share authorized. Buck offered to cancel Harkert's obligations to him and pay $53,625

into the business in consideration of the transfer of 50 percent of the stock to him. Harkert was unwilling to sell 50 percent of the stock on this basis and offered Buck 40 percent of the stock and 50 percent of the control of the business. This arrangement was agreed upon. We point out that the written agreement provided that the board of directors was to be reduced from five to four in number and maintained at that number. This portion of the contract in itself prevented Harkert from electing more than two directors if Buck exercised the right to cumulate his vote. But the agreement went further and provided that each should vote for the two nominees of the other for directors so long as Buck was a stockholder. The evidence is clear that Buck cancelled the indebtedness of Harkert Houses to him and paid the $53,625 in cash on the strength of the control agreement. Without it he would not have agreed to the terms offered. We point out, also, that the agreement in no manner attempted to control the action of directors after they were elected. The claim that the agreement sterilized the board of directors is based on the assumption that the directors nominated by Buck would always vote together. This is probably a practical result, although not one dictated by the agreement. Our statute requires a corporation to have a board of directors of three or more. § 21-111, R. S. 1943. In other words, a board containing an even number of directors is authorized by statute. It would not be unusual for such a board to split evenly on some matters pertaining to corporate policy and thereby create a situation similar to the one before us. Such a situation, in itself, cannot be said to be illegal. The question before us is whether the contract makes it unlawful because of its terms.

It is the contention of the defendants that although a stockholder may vote as he pleases, public policy forbids the enforcement of a contract by which a stockholder undertakes to bargain away his right to vote for directors according to his best judgment, and in the

interest of the corporation. They contend that he has no right to disable himself by contract from performing this duty. Defendants cite the following cases in support of this proposition: Haldeman v. Haldeman, 176 Ky. 635, 197 S. W. 376; Jackson v. Hooper, 76 N. J. Eq. 592, 75 A. 568, 27 L. R. A. N. S. 658; Nickolopoulos v. Sarantis, 102 N. J. Eq. 585, 141 A. 792; Manson v. Curtis, 223 N. Y. 313, 119 N. E. 559, Ann. Cas. 1918E 247; Benintendi v. Kenton Hotel, Inc., 294 N. Y. 112, 60 N. E. 2d 829, 159 A. L. R. 280; Seitz v. Michel, 148 Minn. 80, 181 N. W. 102, 12 A. L. R. 1060; and Smith v. California Thorn Cordage, Inc., 129 Cal. App. 93, 18 P. 2d 393.

The plaintiffs assert that no public policy is violated in the making of an agreement between a majority and a minority stockholder to cause the voting rights in the corporation to be equal when it is beneficial to the corporation for the purpose of bringing fresh money into the business and injures no one except the majority stockholder in voluntarily giving up a part of his voting rights. The following cases are cited in support of this statement: Trefethen v. Amazeen, 93 N. H. 110, 36 A. 2d 266; Ringling Bros.-Barnum & Bailey Com. Shows v. Ringling, 29 Del. Ch. 610, 53 A. 2d 441; Thompson v. The J. D. Thompson Carnation Co., 279 Ill. 54, 116 N. E. 648, Ann. Cas. 1917E 591; Bator v. United Sausage Co., 138 Conn. 18, 81 A. 2d 442; Hart v. Bell, 222 Minn. 69, 23 N. W. 2d 375; Wabash Ry. Co. v. American Refrigerator Transit Co., 7 F. 2d 335 (Certiorari Denied 270 U. S. 643, 46 S. Ct. 208, 70 L. Ed. 776); and Hocking Valley Ry. Co. v. Toledo Terminal R. R. Co., 99 Ohio St. 35, 122 N. E. 35.

An individual discussion of each case cited by the parties is not practical. There are certain fundamentals pertaining to corporate control running through all the cases cited upon which there can be little or no dispute. Among them are the following: A corporation is a creature of the Legislature, and statutes and applicable law prevail over private agreements between stock-

holders. The property of a corporation belongs to the stockholders, but the possession and management thereof is in the hands of the directors. An agreement purporting to control the actions of directors after they are elected, in handling the ordinary business of the corporation, is ordinarily void. A partnership may not disguise itself as a corporation and any agreement purporting to do so is, generally speaking, void. . The law imposes the business management of the corporation on its directors, who represent all the stockholders and creditors, and they cannot enter into agreements among themselves or with stockholders by which they purport to abdicate their independent judgment. Stockholders are powerless in this state to alter or reduce the voting power of any share of stock. As a general rule, stockholders cannot act in relation to the ordinary business of the corporation, nor control the judgment of directors in the performance of their duties. A board of directors acts through its majority and an agreement providing otherwise violates the intendments of the statutes. The separation of voting rights from stock ownership is frowned upon and will be sustained only when authorized by law, or when it is free from fraud of any kind. Many of the cases cited by the defendants involve one or more violations of the foregoing and do not decide the issue under discussion. It must be conceded, however, that the position of defendants does have support in the authorities cited by them.

But we think the correct rule is that stockholders control agreements are valid where it is for the benefit of the corporation, where it works no fraud upon creditors or other stockholders, and where it violates no statute or recognized public policy. "The propriety of the object validates the means and must affirmatively appear." Cone v. Russell & Mason, 48 N. J. Eq. 208, 21 A. 847.

It is not here established that the contract worked a fraud upon the corporation, creditors, stockholders, or any other person. Consequently, the following cases

sustain the validity of the contract on the point under discussion.

Trefethen v. Amazeen, *supra,* is a case in which the agreement between stockholders was for the purpose of securing additional working capital for the corporation and provided that the majority stockholder would waive his right to vote certain shares so long as either of the other two contracting stockholders would own stock in the corporation, so that these two would be able to vote at least 50 percent of the voting stock. The case is very similar on its facts to the case at bar. The court in sustaining the agreement said: "The validity of a contract between stockholders is to be determined by the effects of its provisions. In Bowditch v. Company, 76 N. H. 351, this Court upheld a stockholders' agreement for a voting trust applying as a test the conclusions that there was no wrong to the corporation, no special benefit to the parties to the contract and no turning over of management to strangers. The Court did not leave out of consideration other stockholders individually and creditors. * * * If we apply the above suggested tests to this agreement, it is clear that it is valid. Holden received no special benefit; his only benefit was the general one of all stockholders derived from a corporation with greater working capital. There was no injury to corporation, stockholders or creditors from the addition of new funds. The only detriment was to the parties to the contract and such as they themselves contemplated in the making of it, namely, the paying out of money by two of the parties and the loss of voting rights agreed to by the third party. There was no transfer of control of corporate management, whether for good or ill, to outsiders. The contract merely called for less voting power on the part of an assenting stockholder and relatively greater voting power on the part of other stockholders for a definite period. The effect of this upon other interests no one can say. 'It is not in violation of any rule or principle of law nor contrary to public

policy for stockholders who own a majority of the stock of a corporation to cause its affairs to be managed in such a way as they may think best calculated to further the ends of the corporation, * * *. A stockholders' agreement reasonably intended to be beneficial to a corporation and injurious to no one save for the contemplated detriment to the contracting parties is valid. Violation of the present agreement by the defendant trustee would cause irreparable injury to the plaintiff and he is without adequate remedy at law.' " ·

In Ringling Bros.-Barnum & Bailey Com. Shows v. Ringling, *supra,* the court had before it the question of the validity of an agreement between two stockholders to vote together for a certain slate of directors. For 3 years the two stockholders voted together and elected five of seven directors. The third stockholder by cumulating his vote elected the other two. The two contracting stockholders, Edith Ringling and Aubrey Ringling Haley, each owned 315 shares of stock and the third stockholder, John Ringling North, owned 370 shares. At the 1946 annual stockholders meeting Mrs. Haley voted contrary to the agreement and maintained that the agreement was invalid, or at least revocable. Her contention was based on the proposition that there can be no agreement, or any device whatsoever, by which the voting power of stock of a Delaware corporation may be irrevocably separated from the ownership of the stock except by an agreement which complied with section 18 of the Corporation Law (voting trust statute), and except by a proxy coupled with an interest. It was conceded that the voting trust statute was without application. In holding the agreement valid the court said: . "But the statute does not purport to deal with agreements whereby shareholders attempt to bind each other as to how they shall vote their shares. Various forms of such pooling agreements, as they are sometimes called, have been held valid and have been distinguished from voting trusts. * * * We think the particular agreement before

us does not violate Section 18 or constitute an attempted evasion of its requirements, and is not illegal for any other reason. Generally speaking, a shareholder may exercise wide liberality of judgment in the matter of voting, and it is not objectionable that his motives may be for personal profit, or determined by whims or caprice, so long as he violates no duty owed his fellow shareholders. * * * The ownership of voting stock imposes no legal duty to vote at all. A group of shareholders may, without impropriety, vote their respective shares so as to obtain advantages of concerted action. They may lawfully contract with each other to vote in the future in such way as they, or a majority of their group, from time to time determine. * * * Reasonable provisions for cases of failure of the group to reach a determination because of an even division in their ranks seem unobjectionable. The provision here for submission to the arbitrator is plainly designed as a deadlock-breaking measure, and the arbitrator's decision cannot be enforced unless at least one of the parties (entitled to cast one-half of their combined votes) is willing that it be enforced. We find the provision reasonable. It does not appear that the agreement enables the parties to take any unlawful advantage of the outside shareholder, or of any other person. It offends no rule of law or public policy of this state of which we are aware."

In Thompson v. The J. D. Thompson Carnation Co., *supra*, an agreement was entered into between stockholders to vote their stock for each for directors and for no other person. The Illinois court in upholding the agreement said: "It does not divest or attempt to divest J. M. Thompson of his control or ownership of his stock, or his right to vote the same, except that by the first clause it is provided that the parties to the same shall vote their stock for each other for directors and for no other person or persons. Contracts of this character, by which the owners of a majority of the stock in a corporation agree to vote for certain persons for di-

rectors so as to secure to themselves the control and management of the corporation, are not illegal or void so long as no fraud is committed on the corporation or wrong done to the other stockholders. * * * We held in the case cited that the owners of stock might lawfully contract with each other not to buy or sell stock except for their joint benefit, and that such contracts are not dishonest, violative of the rights of others or in contravention of the public policy of this State. So far as the evidence shows, no fraud was practiced or intended to be practiced by the contract in question, and in our opinion, in so far as its validity is assailed on these grounds, it must be sustained as a valid exercise of the right of contract."

In Hart v. Bell, *supra*, the court said: "Romig and C. W. Hart requested Bell to lend additional money to Sports Afield, but he flatly refused unless he were permitted to acquire enough common stock to give him absolute and permanent control. * * * The trial court by its findings, which are all reasonably sustained by the evidence, determined all these issues in favor of defendants, and specifically found that Bell had, in all his corporate activities and transactions, acted in good faith and to the best advantage and interest of Sports Afield and its stockholders. * * * It is not the province of courts to emasculate the liberty of contract by enabling parties to escape their contractual obligations on the pretext of public policy unless the preservation of the public welfare imperatively so demands. * * * 'the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.' Cole v. Brown-Hurley Hardware Co., 139 Iowa 487, 491, 117 N. W. 746, 748, 18 L. R. A. (N. S.) 1161, 16 Ann. Cas. 846. Quoted with approval in Hollister v. Ulvi, 199 Minn. 269, 280, 271 N. W. 493, 498-499. * * * The practical conduct of a modern business corporation

compels a frank recognition that 'an agreement by a number of stockholders to combine their votes in order to effectuate a particular policy is not of itself unlawful in the absence of evidence of an intent to defraud the other stockholders or to secure a private benefit at the expense of the corporation or the other stockholders.' 66 U. S. L. Rev. (1932) pp. 562, 566. Illegality per se is no longer the inevitable consequence of every agreement by a majority of the stockholders without regard to its purpose or effect."

The case of Manson v. Curtis, *supra,* cited by the defendants, is a leading case on the subject before us. In that case the agreement between stockholders was held to be void because it operated to force an abdication by the directors of the control of the business affairs of the corporation. But it does not hold that stock control agreements are void per se as is evidenced by the following from the opinion of the court in that case: "It is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement, among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Shareholders have the right to combine their interests and voting powers to secure such control of the corporation and the adoption of and adhesion by it to a specific policy and course of business. Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression or wrong against other stockholders or other illegal object."

In a similar case the court said in In re Feinson's Estate, 196 Misc. 590, 92 N. Y. S. 2d 87: "It is now well established that stockholders of a corporation may

validly agree to elect specified persons as directors. Clark v. Dodge, 269 N. Y. 410, 199 N. E. 641; Kassel v. Empire Tinware Co., 178 App. Div. 176, 164 N. Y. S. 1033; Matter of Block's Will, 186 Misc. 945, 949, 60 N. Y. S. 2d 639, 642. Moreover, the complete owners of a corporation may, by agreement among themselves, control the exercise of power and discretion by the directors of the corporation, provided that the interests of creditors of the corporation are not prejudiced and the public policy of the State is not offended. * * * Even though a contract might impinge somewhat upon the provisions of section 27, General Corporation Law, there is no reason for holding it illegal if the enforcement of it 'damages nobody—not even, in any perceptible degree, the public.' Clark v. Dodge, supra, 269 N. Y. page 415, 199 N. E. page 642."

We conclude that stockholders control agreements are not invalid per se. If they are based on a sufficient consideration between the contracting stockholders they are valid and binding if they do not contravene any express constitutional or statutory provision or contemplate any fraud, oppression, or wrong against creditors or other stockholders, or other illegal object. Where such a situation appears it is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy, or upon the officers, including directors, whom they will elect.

The defendants contend, however, that even if the stock control agreements are generally valid under circumstances here shown, the one at bar is invalid for the reason that the agreement which provides that two of a total of four directors shall be nominated by the owners of 40 percent of the stock and elected by the contracting stockholders so long as the contracting party (Buck) shall be a stockholder, is void as being against public policy. While the cases heretofore cited indicate that such a provision in the agreement does not

invalidate the contract under the circumstances, additional cases are cited on this specific point. That there is a division of authority on this point cannot be questioned. We point out once more that the agreement does not place Buck, the owner of 40 percent of the stock, in control of the corporation. It does give him a veto power over questions of corporate policy. It is plain that Buck would not have cancelled the gross indebtedness of $55,650 and paid in the $53,625 in fresh money without the stock control agreement being made. It must be assumed that the purpose of the agreement was to prevent the corporation from getting into financial distress by a continuance of the corporate policy which brought about the necessity for its reorganization at the time Buck became a stockholder. It appears plain that Buck was insistent upon the corporation not spreading itself too thin in the enlargement of its business. The difficulties of Harkert and Buck arose after 11 years of successful operations on the very policy which Buck sought to have maintained when he brought the gross amount of $109,275 into the business by the purchase of 40 percent of the stock. Defendants rely upon Morel v. Hoge, 130 Ga. 625, 61 S. E. 487, 16 L. R. A. N. S. 1136; Odman v. Oleson, 319 Mass. 24, 64 N. E. 2d 439; Luthy v. Ream, 270 Ill. 170, 110 N. E. 373, Ann. Cas. 1917B 368; and cases of similar import to support their position. We think the more reasonable and more modern rule is to the contrary.

Stockholders control agreements which purport to supersede the powers of the directors of a corporation in handling its ordinary business affairs are held ordinarily to be in violation of statutes placing the power of management in the directors. The creation of a dummy board of directors, or, in the language of some of the cases, a sterilized board of directors, by a stockholders control agreement, is usually held to be void. But the mere fact that a board of directors of four members is created with the understanding that each shall nominate

two, is not of itself unlawful. The validity of such a contract is determined by the nature of the restrictions placed upon the board in carrying out their duty to exercise their best judgment in managing the affairs of the corporation. Where the control agreement leaves the directors free to act after being selected, we fail to see where there is a violation of any law or established rule of public policy. The mere fact that a board is created which may split evenly on a matter of corporate policy is not a basis for voiding the contract. In the instant case the directors were free to manage the ordinary business affairs of the corporation without contractual restraint. It is not a dummy or sterilized board within the ordinary meaning of those terms. The following from Clark v. Dodge, 269 N. Y. 410, 199 N. E. 641, seems to state the applicable rule: "Except for the broad dicta in the McQuade opinion, we think there can be no doubt that the agreement here in question was legal and that the complaint states a cause of action. There was no attempt to sterilize the board of directors, as in the Manson and McQuade cases. The only restrictions on Dodge were (a) that as a stockholder he should vote for Clark as a director—a perfectly legal contract; (b) that as director he should continue Clark as general manager, so long as he proved faithful, efficient and competent—an agreement which could harm nobody; (c) that Clark should always receive as salary or dividends one-fourth of the 'net income.' For the purposes of this motion, it is only just to construe that phrase as meaning whatever was left for distribution after the directors had in good faith set aside whatever they deemed wise; (d) that no salaries to other officers should be paid, unreasonable in amount or incommensurate with services rendered—a beneficial and not a harmful agreement. If there was any invasion of the powers of the directorate under that agreement, it is so slight as to be negligible; and certainly there is no damage suffered by or threatened to anybody. The broad statements in

the McQuade opinion, applicable to the facts there, should be confined to those facts."

Defendants next assert that the control agreement is void because of the provision that Harkert be retained as president for an indefinite period at a fixed salary. On this question the authorities again appear to be in conflict, depending in most cases on the nature of the agreement. But we do not feel that we are called upon to decide it in this case. The defendant Harkert for some 11 years participated in carrying out this part of the agreement by accepting the benefits it gave him. It was a provision for the benefit of Harkert and not of Buck. After reaping the benefits for 11 years he now seeks to invalidate the agreement because of the alleged invalidity of a provision made for his benefit. This he cannot do. It hardly requires a citation of authority to hold that one who has received the benefit of the provision for a period of 11 years may not now question the validity of the provision as a basis for invalidating the control agreement to which he is a voluntary party. He is estopped from questioning its validity. Under such circumstances there is no merit to the defendants' contention on this point.

It is also contended that the control agreement is void because it was to remain in effect so long as Buck retained any stock in the corporation. We think not. The purpose of the agreement was to give Buck such protection against mismanagement as to induce him to bring needed money into the corporation. It is reasonable that such protection should be afforded so long as he is a stockholder. It is not a contract which binds the parties in perpetuity, as defendants allege. It is definite as to the term of its existence. The rule was correctly applied in Trefethen v. Amazeen, *supra*, wherein the court said: "Briefly, the present stockholders' agreement was for the purpose of securing additional working capital for the corporation and provided that Mr. Holden would waive his right to vote certain shares so long as either

of the other two contracting stockholders should own stock in the company, so that these two would be able to vote at least 50% of the voting stock. * * * The contract merely called for less voting power on the part of an assenting stockholder and relatively greater voting power on the part of other stockholders for a definite period."

It is urged that the sale and repurchase agreements made by Harkert and Buck prior to 1938 were usurious. We do not deem it necessary to determine that question because of the nature of the consideration recited in the stockholders control agreement. The agreement in part provided: "That, whereas, said party of the second part has this day purchased from Harkert Houses, a corporation of Douglas County, Nebraska, and Walter E. Harkert, President of said corporation, 1200 shares of stock of said Harkert Houses of the par value of $120,000 as evidenced by Certificate No. 39 for 1198 shares issued to the party of the second part and one share issued to Earl K. Buck, President of party of the second part, and one share issued to Rodney B. Devor, Treasurer of party of the second part, and has paid therefor the sum of $53,625 in cash and has canceled and satisfied notes of said Harkert Houses, maker, and of said Walter E. Harkert, maker, which have heretofore been assumed by the said Harkert Houses, in the total gross face sum of $55,650; * * *." No attempt was made to calculate the net amount due Buck from Harkert Houses in the contract, nor to fix the actual value of the stock sold to Buck. The stated consideration was that Buck would pay $53,-625 in cash and cancel the indebtedness of Harkert Houses to him in the "total gross face sum of $55,650." Whatsoever the net amount of the total gross face sum of $55,650 may have been, played no part in the transaction. As a matter of law, the consideration fixed by the agreement is controlling and the net amount due is immaterial to the issue. Defendants are in no position

to assert that the "deals" made prior to the incorporation of Harkert Houses were usurious.

We conclude that the stockholders control agreements were valid under the circumstances here shown and that the declaratory judgment entered on October 29, 1951, was correct in so holding.

In its decree of October 29, 1951, the trial court, after holding that there was a breach of a valid contract on the part of the defendants, authorized the plaintiffs to institute ancillary proceedings to recover such damages, if any, resulting from the breach of contract. Jurisdiction to entertain such further application and to render complete relief in damages was therein specifically retained.

Plaintiffs thereafter filed a supplemental petition setting forth the damages they are alleged to have sustained. The nature of such damages are summarized in plaintiffs' brief and for the purposes of the question to be considered, they will be accepted. It is claimed that the following items would not have been expended if the stockholders control agreement had not been breached by Harkert and his associates and, plaintiffs being the owners of 40 percent of the stock of the corporation are entitled to a personal judgment for 40 percent of the losses sustained. The items of damage, briefly stated, are: Attorney fees paid by the corporation in this litigation, $4,000; accountant fees paid by the corporation in this suit, $930.25; excessive expenditures at the Athletic Club location, $18,085.32; excessive salary paid to Fitzgerald, Schwentker, and Clara Harkert, $5,264.52; proceeds of corporate bonds used in purchase of Farnam Street building, $25,000; proceeds of corporate bonds used in establishment of the restaurant in Lincoln, $37,000; expenditure of corporate earnings in paying off the mortgage on the Farnam Street building, $25,000; expenditure of corporate funds on Lincoln restaurant over and above that derived from the sale of bonds, $15,639.60; and rent paid on location leased and

not used by the corporation, from June to December 1951, $2,100. The total of these items is $133,019.69, 40 percent of which is $53,207.87 for which plaintiffs sought judgment. In addition to the foregoing, defendants are charged with waste and mismanagement of the corporate business, thereby causing the net profit for the first 6 months in 1951 to be only $25,009 as against $41,766.04 and $47,519.73 for the same periods in 1950 and 1949, respectively. The defendant Walter E. Harkert is charged with using funds of the corporation in the amount of $2,185 for the purchase of an automobile for his own use and in making loans of corporate funds to his friends and relatives in the amount of $2,890 which have been outstanding and unpaid for 2 years. Plaintiffs allege that they have been damaged by the breach of the stockholders control agreement on the part of the defendants in an amount not less than $100,000. A trial was had on the issues thus presented which resulted in the decree of January 14, 1953, awarding plaintiffs a judgment against the defendants Harkert in the amount of $33,612.

The defendants assert that plaintiffs had no personal cause of action against the defendants Harkert and that the damages alleged, if proved, run in favor of the corporation. In other words, the contention of the defendants is that any action to recover the damages alleged must be brought in the name of the corporation, either by the corporation itself or, upon its refusal or failure to do so, by a stockholder in a representative action. The plaintiffs contend that the action is personal to them because of the stockholders control agreement which was entered into between E. K. Buck Retail Stores and the defendants Harkert, personally, as stockholders.

The general rule is stated in Ruplinger v. Ruplinger, 154 Neb. 394, 48 N. W. 2d 73, as follows: "A stockholder may not bring an action in his own name to recover for wrongs done to the corporation or its property. Such

a cause of action is in the corporation and not the stockholders. The right of a stockholder to sue is derivative in its nature and can be brought only in a representative capacity for the corporation."

We point out that every item of damage claimed, if the defendants are liable therefor, is a wrong committed against the corporation or its property. The damages alleged either deplete corporate funds, convert property of the corporation into unauthorized investments, or tend, because of inept management, to reduce the value of the stock of all stockholders. Such damages ordinarily fall within the general rule and create a cause of action on the part of the corporation or a representative suit by a stockholder. It is the contention of the plaintiffs that the stockholders control agreement calls for a different result in the present cause that raises the precise question to be decided.

In Smith v. Bramwell, 146 Ore. 611, 31 P. 2d 647, the court after recognizing the general rule stated: "Appellant recognizes the rule as above stated, but asserts that it has no application to the particular facts involved in this case. Plaintiff contends that his action is based upon a violation of the voting trust agreement and that, by virtue of such contractual relationship, he may maintain the action in his own behalf even though there was a direct damage to the corporation. * * * We cannot agree that the instant action is predicated upon a breach of the voting trust agreement. Some of the defendants were not parties to this trust agreement. When confronted at the commencement of the trial by the objection to the introduction of any testimony for the reason that the complaint failed to allege a cause of action, the plaintiff undertook to bring himself within the exception to the general rule, relative to actions by stockholders against officers of a corporation, by showing a contractual relationship under the voting trust agreement. But, as we have endeavored to show, a breach of this voting agreement did not con-

fer upon the plaintiff a right to an individual and direct action, as distinguished from a derivative one, as any loss sustained by plaintiff by reason of the breach was, under the facts alleged, common to all stockholders."

In Green v. Victor Talking Machine Co., 24 F. 2d 378, 59 A. L. R. 1091, the court said: "Nor does the allegation of a contractual duty to plaintiff's testator aid her. If it be assumed that the allegations of the complaint are sufficient to charge a contractual duty owing by defendant to the Pearsall Company, despite the indefiniteness of the terms of such a contract, and despite the fact that it was made with a shareholder, not with the corporation, nevertheless a breach of that duty would give a right of action to the corporation, not to its shareholders."

To like effect is Wells v. Dane, 101 Maine 67, 63 A. 324, which states: "The plaintiff was not the corporation notwithstanding he owned and controlled a majority of its stock. He did not own or control its property or make or cancel its contracts with the defendant Dane. * * * He was injured the same as every other shareholder because of and through the injury to the corporation property and rights. There was no special injury to the plaintiff different from that to all other shareholders, nor were his individual rights injured outside of the injury suffered by the collective entity the corporation. 'A shareholder cannot sue individually for damages caused by wrongful acts impairing the value of his shares through an invasion of the corporate or collective rights.' Morawetz Pri. Corp. section 236 a. In such cases, if the regular officers of the corporation are unable or unwilling to take the necessary steps to protect the corporate property and interests, a shareholder may proceed in equity on behalf of himself and other stockholders and the company. At law, however, the corporation itself representing all those rights can alone recover for such injury. Any other rule would admit of as many suits against the wrongdoer as there were

stockholders in the corporation. * * * There may be cases of injuries to the individual rights of the shareholder where he and not the corporation must seek redress, such for instance as the levying of an unlawful tax on shares held by the individual stockholder, mutilation or destruction of his certificate, or circulating false and scandalous reports or issuing spurious certificates thus creating uncertainty as to the title or validity of existing shares. In all such cases, however, the wrongful act affects the shares directly. They are readily distinguished from the case at bar where the plaintiff claims his shares were depreciated by wrongful acts making possible the issue of 600 shares of stock without payment therefor. Such a wrong being primarily against the corporation, the redress for it must be sought by the corporation."

Other cases to the same effect are: Commonwealth of Massachusetts v. Davis, 140 Tex. 398, 168 S. W. 2d 216; Coronado Development Corp. v. Millikin, 175 Misc. 1, 22 N. Y. S. 2d 670; and Liken v. Shaffer, 64 F. Supp. 432.

The plaintiffs rely upon the case of Ritchie v. McMullen, 79 F. 522, wherein the court said: "But we are of opinion that this principle has no application where the wrongful acts are not only wrongs against the corporation, but are also violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly by him to the stockholders." Other cases cited are: In re Auditore, 249 N. Y. 335, 164 N. E. 242, 62 A. L. R. 551; R. G. Dun & Co. v. Shipp, 127 Tex. 80, 91 S. W. 2d 330; Meyerson v. Franklin Knitting Mills, 172 N. Y. S. 773; and Keating v. Hammerstein, 209 N. Y. S. 769.

It is true that the line drawn by the cases determining when a stockholder may or may not sue in person is not too well defined. At least the reasoning contained in them does not uniformly point to the same result. The better rule seems to be that a stockholder may sue personally, as distinguished by suit in a representative

capacity, when he has sustained a loss separate and distinct from that of other stockholders. The entry of the parties into the stockholders control agreement did not operate to confer upon plaintiffs the right to an individual direct action that did not exist before. We point out that the control agreement is upheld on the theory that it was for the benefit of the corporation and all stockholders alike. If it had operated to bestow special privileges upon one or both of the stockholders at the expense of stockholders not a party to the agreement, the validity of the agreement would appear doubtful. Plaintiffs assert no cause of action peculiarly their own as distinguished from other stockholders. The control agreement purports only to establish a business policy for the corporation, the continuance of which is assured by the contractual right of Buck to nominate two of the directors. The plaintiffs, therefore, find themselves in a situation where they must choose between two courses of action,—sustain the control agreement and seek their remedy for damages by a representative suit or, on the other hand, assert special rights appurtenant to their shares of stock and have no cause of action at all for damages resulting to all stockholders. Plaintiffs clearly chose the wrong remedy under the facts presented.

To hold that plaintiffs could sue personally in the present case would authorize a suit by each stockholder and result in a multiplicity of suits. The damages alleged are to the corporation which is owned by all the stockholders. It follows that a right of a stockholder to sue under the facts pleaded is derivative only. The recovery, if any, would be in favor of the corporation and, indirectly to all stockholders. The supplemental petition sets forth the damages alleged to be due to the breach of the control agreement by the defendants. Plaintiffs pray that 40 percent thereof, based on their ownership of 40 percent of the stock of the corporation, indicating that plaintiffs recognize that the damages resulted to all stockholders, shall be awarded to them

personally. In other words, for a direct injury to the stock of a stockholder, not common to all stockholders as such, plaintiffs may pursue a personal action. The plaintiffs do not come within this rule in the case at bar. When the injury is to the collective rights of stockholders and the corporate property has been augmented by restitution, the plaintiffs, who have suffered as one of these, will be fully indemnified. If a stockholder is permitted to bring an action personally to recover his proportionate share of the damages suffered by the corporation, a subsequent recovery by or for the corporation would be equivalent to a double recovery by him. To permit such an action by the stockholder individually could possibly injure the rights of creditors and taxing authorities. The reasoning of the cases that a stockholder cannot sue personally for damages where only his derivative or corporate rights have been infringed, appears unassailable. We hold, for the reasons stated, that plaintiffs have neither alleged nor proved any right to damages for which they could sue personally in their capacity as stockholders. The judgment in the amount of $33,612, bearing date of January 14, 1953, is therefore reversed and the pleading designated as an ancillary and supplemental petition is dismissed.

For the reasons herein stated, the decree of October 29, 1951, is affirmed, and the decree of January 14, 1953, is reversed and the pleading designated an ancillary and supplemental petition is dismissed.

AFFIRMED IN PART, AND IN PART REVERSED AND DISMISSED.