(No. 24862.—

DAVID A. SEELY *et al.* Appellees, *vs.* MARCUS W. ROWE, Appellant.

*Opinion filed December 19, 1938—Rehearing denied Feb. 8, 1939.*

SHAW, C. J., took no part.

ROBERT W. BESSE, for appellant.

WARD, WARD & SCHEINEMAN, and JOHN A. RIORDON, for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Mary Adams, a spinster aged eighty-three, died in Los Angeles, California, on June 17, 1936. By her will she

gave a large part of her estate to her nephew, David A. Seely, and her nieces, Addie Plunkett, and Kate Washburne, who were her only heirs-at-law.   On June 19, 1936, appellant, Marcus W. Rowe, filed in the recorder's office of Whiteside county, Illinois, a deed which purported to convey to Rowe 302 acres of land in that county and which reserved a life estate to the grantor, Mary Adams.   On June 29, 1936, her heirs filed their complaint in the circuit court of Whiteside county to set aside this deed.   Later, the remaining appellee, Theodore H. Taber, executor of her will, filed his complaint to set aside the deed and alleged substantially the same facts as that those alleged by the heirs. The facts alleged were that on April 8, 1936, the date of the deed, and for a long time prior thereto, Mary Adams had been suffering from infirmities due to advanced age; that she was extremely deaf, and that her vision had become impaired.   It was also alleged that appellant, Marcus W. Rowe, was her business adviser when the deed was executed and had been for a long time prior thereto; that Mary Adams had become dependent upon him for assistance and advice in business matters; that the deed was made under the undue influence of him; that if the deed was executed by her it was never delivered; that if it was delivered the delivery was in trust for the original plaintiffs in this cause; that Rowe took no possession of nor exercised any control over the land until after Mary Adams' death, and that after her death he executed and delivered a deed conveying the farm in question to a third person.   The executor's complaint also set out Mary Adams' will executed May 3, 1933.   It directed her executor to provide for the perpetual care of the Adams' family lot in Portland cemetery by expending a sum not to exceed $500, and to dispose of her personal effects among her relatives or friends as he might think best.   Her executor was directed to convert, into money or securities, all the rest, residue and remainder of her property, and to distribute the pro-

ceeds. Appellant was given $800, and each of her heirs was given $5400. After the payment of the above legacies, taxes and costs of administration, the residue of her estate was given to the First Congregational Church of Prophetstown, Illinois. The appellant denied all the material allegations of the complaints. The cause was referred to the master in chancery who heard oral testimony and considered depositions which were taken in Los Angeles. He recommended a decree in favor of appellees. Objections to his report were overruled and ordered to stand as exceptions. The exceptions were overruled and a decree was entered setting aside the deed and declaring it to be of no effect. A freehold is involved, and Rowe has appealed directly to this court.

His principal contention is that the evidence is wholly insufficient to sustain the finding of fraud and undue influence. Appellees concede that where all of the evidence has been taken, either by deposition or before the master, we are not bound by the rule that the finding of the chancellor will not be disturbed unless it is manifestly against the weight of the evidence, but they insist that the decree finds substantial support in the evidence.

It is shown by the record that Mary Adams went to California to live in 1912. She required mechanical aid to assist her hearing, unless the speaker shouted directly into her ear, and her vision had become impaired by cataracts, but it seems to be conceded by all sides that, with the assistance of others, she could transact her business affairs, at least until after she suffered a stroke about May 6, 1936. She had a private secretary who read to her and wrote letters for her once a week. During the remainder of the time she was dependent on those who were around her to read to her and to assist her in carrying on her business affairs. She lived on the income from the farm described in the deed in question and most of her business concerned that farm and her own domestic affairs.

Marcus W. Rowe was a second cousin and he seems to have been the only relative she had in California. Her nephew, David Seely, was seventy-three years of age at the time of the trial. He had lived at his aunt's home from the age of two and one-half to five years, and from the age of twelve to nineteen years. His mother died when he was fourteen years of age and his aunt assisted in caring for him both before and after that time. He moved to Colorado, where he still lives, and Mary Adams visited him on her way to California in 1912. They corresponded up to the time of her death, and Seely and his wife visited her in 1925, 1933, and 1936. On the last visit they stayed three months. On several occasions Mary Adams expressed concern over her nephew and nieces because they had no means. Kate Washburne was a particular object of concern because she, also, was deaf and had been deserted by her husband. Opposed to this, there is evidence that Mary Adams and David Seely had a disagreement during his last visit, and that she no longer intended to leave her property to her three heirs. The appellant insists that the appellees did not prove the existence of a fiduciary relation. He contends that none ever existed, or, at most, that it existed only during the last few weeks of Mary Adams' life, after she had a stroke May 6, 1936, to her death, June 17, 1936. Although she regained consciousness shortly after the stroke, and recovered sufficiently to walk around her quarters at the Wesley Terrace Hotel, she required constant medical attention and nursing thereafter. On June 7, 1936, appellant arranged her transfer to the Harvard Rest Home, a private ten-bed sanitarium, so that she might have better attention. It is undisputed that, during this period, appellant cashed checks and ran errands for her and that money was placed in his name so that he might write the checks himself. He had charge of the funeral arrangements and shipped the body and her personal effects back to Illinois. There is some evidence tending to show that Rowe per-

formed similar duties for her before this period. Appellees produced evidence to show that the signature appearing on the deed in question was not, in fact, written on April 8, 1936, but that it was written sometime after she suffered the stroke. Both sides produced expert testimony as to handwriting to show when the signature on the deed was written. Albert T. Scovill qualified as an expert on handwriting and testified for appellees. He made an extensive examination of the signature on the deed and compared it with other admittedly genuine signatures of Mary Adams which were made both before and after April 8, 1936. He made photographic enlargments of the signatures, and was of the opinion that the signature on the deed was written after May 5, 1936. He based his opinion on the fact that the signatures which were admittedly written before she suffered the stroke were written in a fairly firm hand, while in those written afterward the lines were irregular, the spacing between the letters and the starts and stops in the writing of the name, were different. He gave a detailed description of the handwriting of Mary Adams during the period before the alleged execution of the deed and described how it differed from the signatures made after May 5. On the other hand, Herbert J. Walter, who also qualified as a handwriting expert, compared the signature on the deed with the same standards of comparison and was of the opinion that the signature was written on April 8, 1936. He said that it could just as well be insisted that it was written earlier as after that time. The signature is admittedly the genuine signature of Mary Adams, and our sole inquiry in this regard concerns when it was made. The master saw and heard both expert witnesses. He accepted the testimony of Albert T. Scovill, and we are of the opinion he was justified in doing so.

In order to prove that the execution of the deed was fairly made, appellant offered the deposition of Amber Morrison, who took the acknowledgment to the deed. She

testified that she went to Mary Adams' rooms at the Wesley Terrace Hotel on the evening of April 8, 1936. Appellant and Mary Adams were there. Miss Morrison was a stenographer for appellant's attorney in Los Angeles. Appellant left the room immediately after Miss Morrison arrived, and she read the deed over to the grantor and asked her if she understood that she was reserving a life estate. Mary Adams said she knew what she was doing and while sitting in bed signed the deed which, for her convenience, had been placed on a cardboard. Appellant then came back into the room and Mary Adams handed him the deed and said: "It is yours." He protested that she should not give him the land but that she ought to give it to her heirs. On cross-examination this witness testified that, although the law of California required her to do so, she kept no notarial record of acknowledgments, and that her only means of recollecting the date of the execution of the deed aside from the date on the deed itself was from a calendar memorandum, which she had destroyed at the end of 1936. Albert M. Chase, an attorney in Los Angeles, testified that Mary Adams came to him in the spring of 1936 to ask him how she could give her property away and reserve a life estate. He was not certain about the name of the grantee or about the date, and in order to reach his office it was necessary for Mary Adams to climb a flight of thirty-two steps. He had acknowledged a power of attorney for her in 1935, but had done no other business for her. His testimony fails to convince us that she had independent advice concerning the making of the deed here attacked.

We need not detail the testimony concerning the relationship existing between appellees and Mary Adams, or between appellant and Mary Adams. Witnesses testified by deposition for both sides to statements that the grantor loved David Seely, Addie Plunkett and Kate Washburne There was also testimony that on the occasion of the last visit David Seely overstayed his welcome, and irritated his

aunt, and that she became upset over a quarrel they had. But there is nothing which even tends to show that she ever changed her feelings towards Addie Plunkett and Kate Washburne and wanted to deprive them of the benefit of her property by conveying it to the appellant.

The principles of law controlling this case are well defined. Courts of equity have refused to set any bounds to the circumstances out of which a fiduciary relation may spring. It includes all legal relations, such as attorney and client, principal and agent, guardian and ward, and the like, and also every case in which a fiduciary relation exists in fact, where confidence is reposed on one side and domination and influence result on the other. (*Mors* v. *Peterson,* 261 Ill. 532; *Kosakowski* v. *Bagdon,* 369 id. 252; *Beach* v. *Wilton,* 244 id. 413.) The relation need not be legal, but it may be either moral, social, domestic, or merely personal. (*Mors* v. *Peterson, supra; Roby* v. *Colehour,* 135 Ill. 300.) Transactions with a fiduciary are presumptively fraudulent, and will be stricken down unless he establishes their fairness by clear and convincing proof. *Mors* v. *Peterson, supra; Kosakowski* v. *Bagdon, supra.*

Appellant places much reliance on the case of *Masterson* v. *Wall,* 365 Ill. 102, where we upheld a transaction between an aged client and his attorney. Other cases involving undue influence are of little assistance unless the facts are closely identical. In the *Masterson case,* we held that the attorney had sustained the burden of proving that the transaction was knowingly and understandingly made. The consideration in that case was a benefit to the grantor, because he received a present living and the consequent peace of mind, in exchange for his property. There was ample evidence to show that no advantage was taken of the confidential relation. That case is not persuasive.

The evidence in this case proves that a fiduciary relation existed between Mary Adams and Marcus W. Rowe at the time the deed in question was executed. He was actively

transacting all the business that she had to transact in California. He was, so far as the record shows, her only relative there, and it does not appear that she had many friends out there. He was the natural person for her to rely on, and the record shows that he did treat her kindly. It is no answer to argue that David Seely also had her confidence, because he performed the same kind of duties when he was there. It is not charged that he violated a fiduciary relation. The deposition testimony was not convincing, because of the obvious bias of the witnesses for both sides, and much weight should not be given to it. There are a number of suspicious circumstances which have not been explained. The deed, although bearing date of April 8, 1936, was not recorded until June 19, 1936, only two days after Mary·Adams' death. This delay would not be so significant if it were not for this haste. Appellant did not notify the insurance company which carried the risk on the farm buildings that there had been a change in ownership. He conveyed the farm to Sid W. Rumball by a deed dated June 30, 1936, and acknowledged July 2, 1936, but this suit had been filed June 29, 1936, and so the conveyance was made *lis pendens*. Certain checks which might have been useful as a basis of comparison of signatures were missing from the personal effects of Mary Adams, when they were shipped to Illinois, and, since appellant had custody of them, it was his duty to explain what became of them. In this state of the record appellant has not sustained the burden of proving the transaction was fair. The findings of the master, approved by the chancellor, are supported by the evidence.

The appellant urges that the trial court erred in admitting evidence that should have been excluded. The objections filed to the master's report did not raise any question concerning the admission of evidence. The same is true of the exceptions, since the objections stood as exceptions before the chancellor. In *Northern Trust Co.* v. *Sanford,*

308 Ill. 381, 388, we pointed out that it is necessary to object to the ruling of the master and obtain the court's ruling on the master's action, in order to take advantage of errors in the admission of evidence. If the master errs in such ruling, the chancellor can correct the mistake by ordering the master to proceed in the correct manner, if it is brought to his attention. If the point is not brought to the chancellor's attention it cannot be considered on review. The errors relating to the admission of evidence need not be considered.

Appellant contends that the production by the grantee of the deed duly acknowledged before a notary is sufficient proof of the execution of the deed by the grantor. It is admitted that the signature to the deed is genuine, and this contention is beside the point.

The decree of the circuit court is right, and it is affirmed.

*Decree affirmed.*

Mr. Chief Justice Shaw took no part in this decision.