Emma Galler, Individually, and as Trustee Under a Trust Agreement Dated July 21, 1956, and as Executor of the Last Will and Testament of Benjamin A. Galler, Deceased, Plaintiff-Appellee, v. Isadore A. Galler, Rose Galler, and Aaron Galler, Defendants-Appellants.

**Gen. No. 49,002.**

First District, Second Division.

January 7, 1964.

Rehearing denied February 10, 1964.

452

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of Chicago (Frank D. Mayer, Robert L. Stern, Edward R. Lev, and George Bobrinskoy, Jr., of counsel), for appellants.

Arvey, Hodes and Mantynband, of Chicago (Sidney R. Zatz and Jack H. Oppenheim, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from a decree of the Superior Court of Cook County entered on June 23, 1962, approving the report of a Master and overruling exceptions thereto, and decreeing specific performance of a shareholders' agreement, ordering the defendants to account for all monies received by them from the corporation since September 25, 1956, and retaining jurisdiction of the cause and of the parties to effectuate the aforementioned decrees and orders. The court expressly found that there is no just reason for delaying enforcement or appeal of this decree in accordance with Section 50(2) of the Civil Practice Act.

There is little dispute as to the facts of this case. Defendants never took the stand in their own behalf and the plaintiff established her own version of the facts. This suit was brought by Emma Galler, the wife of the deceased Benjamin Galler, to enforce an agreement entered into between Benjamin and his brother, Isadore, in July, 1955, for the purpose of providing income for the support and maintenance of their immediate families. Benjamin and Isadore each owned 47½% of the stock of the Galler Drug Company. The remaining 5% of the stock was owned by Mandel Rosenberg, a trusted employee, who did not complain of the agreement and who subsequently disposed of his stock to Isadore and his wife Rose. Subsequent to the death of Benjamin Galler, Isadore refused to enforce the provisions of the agreement.

The defendants-appellants attack the decree and orders of the court below for the following reasons: (1) the agreement violates the Illinois Business Corporation Act and is therefore invalid and unenforceable; (2) by her acquiescence in the continuation of a board of three directors, and in the management of the corporation by defendants, and by her acceptance of the benefits thereof, plaintiff is estopped from maintaining this action; (3) the Master erred in excluding relevant testimony; (4) the court erred in ordering an accounting; (5) the Master's fee is excessive.

█ █ We can see no substantial basis to appellants' points 2 and 3. No basis for estoppel exits. The plaintiff testified uncontroverted and sufficient justification for her actions appears of record. The testimony which was excluded by the Master was not called to the attention of the Chancellor for review and was therefore waived. Seely v. Rowe, 370 Ill 336, 344, 18 NE2d 874; 3 Nichols Illinois Civil Practice, Ch 52, § 2937, p 357.

■ Aside from the separate matters of the accounting and the Master's fees, in both of which we think the court erred, the real issue of this appeal is whether the shareholders' agreement as a matter of law violated the Business Corporation Act or the public policy of our state.

The purpose of the agreement is to provide income and support for the immediate families of Isadore and Benjamin. The contested sections of the agreement provide: (2) that the bylaws of the corporation will be amended to provide for a board of four directors; that the necessary quorum shall be three directors; and that no directors' meeting shall be held without giving ten days notice to all directors. (3) The shareholders will cast their votes for the above named persons (Isadore, Rose, Benjamin and Emma) as directors at said special meeting and at any other meeting held for the purpose of electing directors. (4, 5) In the event of the death of either brother his wife shall have the right to nominate a director in place of the decedent.

(6) Certain annual dividends will be declared by the corporation. The dividend shall be $50,000 payable out of the accumulated earned surplus in excess of $500,000. If 50% of the annual net profits after taxes exceed the minimum $50,000, then the directors shall have discretion to declare a dividend up to 50% of the annual net profits. If the net profits are less than $50,000, nevertheless the minimum $50,000 annual dividend shall be declared, providing the $500,000 surplus is maintained. Earned surplus is defined.

(9) The certificates evidencing the said shares of Benjamin Galler and Isadore Galler shall bear a legend that the shares are subject to the terms of this agreement.

(10) A salary continuation agreement shall be entered into by the corporation which shall authorize

the corporation upon the death of Benjamin Galler or Isadore Galler, or both, to pay a sum equal to twice the salary of such officer, payable monthly over a five-year period. Said sum shall be paid to the widow during her widowhood, but should be paid to such widow's children if the widow remarries within the five-year period.

(11, 12) The parties to this agreement further agree and hereby grant to the corporation the authority to purchase, in the event of the death of either Benjamin or Isadore, so much of the stock of Galler Drug Company held by the estate as is necessary to provide sufficient funds to pay the federal estate tax, the Illinois inheritance tax and other administrative expenses of the estate. If as a result of such purchase by the estate of the decedent and the amount of dividends to be received by the heirs are reduced, the parties shall nevertheless vote for directors so as to give the estate and heirs the same representation as before (2 directors out of 4, even though they own less stock), and also that the corporation pay an additional benefit payment equal to the diminution of the dividends.

In the event either Benjamin or Isadore decides to sell his shares, he is required to offer them first to the remaining shareholders and then to the corporation at book value, according each six months to accept the offer.

█ There are several factors which the courts commonly discuss when considering shareholders' agreements: (1) the purpose or object of the agreement; (2) the concepts of public policy prevailing in the jurisdiction regarding literal interpretation of provisions of the Business Corporation Act to close corporations; (3) whether or not all of the shareholders in the corporation are parties to the agreement; (4) the length of time during which the agreement will control the shareholders' right to vote their shares; (5) who is challenging the agreement.

Appellants contend that the rule in Illinois is that an agreement which has as its sole purpose or object the financial support of the families of the shareholders is void. We have not found a case in Illinois in which this argument has been applied although the principal has been stated by text writers (1 O'Neal Close Corporations, Ch V, § 5.15), and appears often as dicta (Venner v. Chicago City Ry. Co., 258 Ill 523, 101 NE 949). Hale Private Corporations, 1916, Ch X, § 140, states the rule at 197:

> "In determining whether a voting agreement or a voting trust is valid, we must look to its purpose. Its purpose is always for the benefit of the persons who enter into the trust, otherwise it would not be created; but such benefit to participating stockholders may be achieved through a benefit to the corporation, or at the expense of the corporation, and to the detriment of the nonparticipating stockholders. In order to be legal, a voting trust must contemplate the benefit of its participants through the corporation, i. e., the plan of the trust must be for the benefit of the participants as stockholders and not as individuals, or at least it must not in any of its phases be an injury to the corporation or to the other stockholders. If the voting agreement or trust is for the benefit of the individuals who compose it and not for the benefit of the corporation or its other stockholders, it will be invalid."

This case stands midpoint between those cases striking down agreements which provide that a certain person be elected to a specific office for a number of years and emphasize the disregard of fiduciary duties by the directors to the corporation (Teich v. Kaufman, 174 Ill App 306, 312; Amos v. Helwig, 19 Ill App 2d 220, 153 NE2d 245), or the injury or unfairness to noncontracting shareholders (Odman v. Oleson, 319

Mass 24), and those cases upholding agreements because the purpose of the agreement is to carry out a policy beneficial to the corporation as a whole (Faulds v. Yates, 57 Ill 416; Kantzler v. Bensinger, 214 Ill 589, 73 NE 874; E. K. Buck Retail Stores v. Harkert, 157 Neb 867). The agreement in this case is admittedly for the benefit of the families of the majority shareholders as individuals. Since we have found little case law bearing on this exact situation this purpose is not of itself determinative and will be weighed with other factors.

The public policy of most jurisdictions allows some latitude in an agreement among shareholders of a close corporation from the rule that the business of a corporation shall be managed by a board of directors (Ill Rev Stats, c 32, § 157.33). No court will completely ignore the provisions of the Corporation Act. Kantzler v. Bensinger, 214 Ill 589, 600, 73 NE 874.

Indeed, there is no objection to provisions (2) (3) and perhaps (4) standing alone. Similar provisions have been consistently upheld. Thompson v. J. D. Thompson Carnation Co., 279 Ill 54, 116 NE 648; Kantzler v. Bensinger, 214 Ill 589, 73 NE 874; Faulds v. Yates, 57 Ill 416.

Appellants contend that this agreement violates Section 28 (Cumulative voting provision); Section 41 (Directors shall declare dividends); Section 6 (Corporation may not purchase its own shares when its net assets are less than its stated capital); Section 42.8 (Directors who assent to the declaration of any prohibited dividend to a director shall be guilty of conspiracy); and Section 58 (No purchase of redeemable shares shall be made which will reduce the remaining assets of the corporation below an amount sufficient to pay debts and liabilities of the corporation as they mature). Although each of these violations technically occurred, some of them are of the type which courts

customarily disregard when dealing with a close corporation and need not be discussed.

Provision 6 of the Galler agreement is a carefully worked out mandatory schedule for the payment of dividends. The declaration of dividends is generally considered to be within the discretion of the board of directors. 1 O'Neal Close Corporations, Ch V, § 5.21, p 281; Hornstein, Stockholders' Agreements in the Closely Held Corporations, 59 Yale LJ 1040, 1045. Agreements which place reasonable restrictions on powers of the directors by prohibiting the declaration of dividends are usually sustained. Fitzgerald v. Christy, 242 Ill App 343. Very few cases have upheld a compulsory affirmative dividend policy. See Clark v. Dodge, 269 NY 410. The agreement construed in Kantzler v. Bensinger, 214 Ill 589, 73 NE 874 contained a provision providing for the payment of dividends. The court however did not discuss this provision in its opinion. (The provision in the Kantzler case was part of a purchase agreement. The dividend provision was clearly part of the consideration for the sale.) Too many factors are involved in the declaration of dividends for all to be explicitly detailed in advance. The infirmity in these provisions is not so much that they provide for the payment of dividends but that they are mandatory. See comment, 43 Cornell LQ 68, 79 (1957). Standing alone we would be compelled to strike down the dividend provision of the Galler agreement.

Although the salary continuation provision is precatory in form it suffers from other infirmities. There are very few cases treating a salary continuation to the widow of an officer and shareholder of a corporation; those that do, however, state the general rule to be that a gift of its property by a corporation not created for charitable purposes is in violation of the rights of its shareholders and is ultra vires. 6A

459

Fletcher Cyclopedia of Corporations, § 2939, pp 667, 668. This rule has been applied to widows who receive compensation and who have never rendered service to a corporation even where there was a precatory clause. See Moore v. Keystone Macaroni Mfg. Co., 370 Pa 172; 29 ALR2d 1256, 1263. Although the specific charge of ultra vires is not raised and perhaps could not be raised by any shareholders here, we take note of it in weighing the validity of the agreement.

Provisions (11) and (12) are objected to as infringing on the constitutional requirement of cumulative voting in that they give voting power to a shareholder disproportionate to his holding of the corporation's voting shares. This exact contention was presented to the Nebraska Court in E. K. Buck Retail Stores v. Harkert, 157 Neb 867, 45 ALR2d 774, 806, in upholding the provision and after pointing out that the right to cumulative voting is personal and may not be abridged by the corporation the court stated:

> "It is asserted, however, that an agreement between stockholders as to how stock shall be voted at the election of directors ipso facto changes the manner of election prescribed by the constitution. To so hold would have the effect of invalidating existing statutes relating to voting trusts and all other forms of voting combines by a majority of the stock to control the management of the corporation, which were recognized at common law."

The above reasoning would apply equally well in Illinois. (It is to be noted that throughout E. K. Buck v. Harkert, supra, the court emphasized that the purpose of the agreement was to induce Buck to bring needed money into the corporation.) Standing alone provisions (11) and (12) do not violate the constitutional cumulative voting requirement.

An important factor in determining the validity of a shareholders' agreement is whether the rights of minority holders are protected. In this case there are no minority holders. Mandel Rosenberg sold his 5% to Isadore Galler, and, although the ownership is involved in litigation, it is unlikely that the final owner of that stock will be a new minority holder. Where there are no minority holders courts are inclined to relax a strict application of public policy and statutory considerations. Faulds v. Yates, 57 Ill 416; Kantzler v. Bensinger, 214 Ill 589, 73 NE 874.

There is no time limitation to the Galler agreement. The appellees urge that it is clearly limited by the life span of Rose and Emma Galler. In our view it has an unpredictable duration and may reasonably have lasted in excess of twenty-five years. (According to "Vital Statistics of the United States," U. S. Dept. of Health, Education and Welfare, 1959, Emma Galler, who was 51 at the time of the death of her husband, had a life expectancy of 26.9 years.) The time factor is usually not in itself determinative providing that there is no legislation to the contrary. 1 O'Neal Close Corporations, Ch V, § 5.09, p 245. Odman v. Oleson, 319 Mass 24, invalidated an agreement with an unlimited time duration. Leventhal v. Atlantic Finance Corp., 316 Mass 194; Clark v. Dodge, 269 NY 410; and E. K. Buck Retail Stores v. Harkert, 157 Neb 867, upheld agreements of indefinite duration.

The appellants argue that the spirit of the voting trust statute (Ill Rev Stats, c 32, § 157.30(a)) establishes a ten year-limitation for all forms of voting control agreements. The only case in which we have found a similar contention considered was Wallace v. Southwestern Sanitarium Co., 160 Kan 331. The court there felt that the same policies did not apply. The main objective of the voting trust statutes has been to prevent the separation of voting power from

beneficial ownership for a long period of time, and by registration to serve as notice to potential stock purchasers and to the state that a corporation is in the grips of a control combine. Since there are usually no potential purchasers to a closely held corporation the registration provisions need not be discussed.

There is merit to appellants' position that at some point any control agreement constitutes a separation of voting power from beneficial interest. See note, 3 University of Chicago Law Review, 640, 641. The courts will usually presume that when a shareholder binds his vote on a corporate policy for a short period of years he knows what he is doing. Where the duration of the agreement contemplates a longer period, the courts will look more carefully at the purpose and effect of the agreement. There is probably no absolute point at which an agreement becomes illegal. The ten-year limitation of the voting trust statute is arbitrary. At common law voting trusts were held valid in excess of twenty years. The unpredictable duration of the Galler agreement warrants a more than cursory consideration of its purpose and its deviation from corporate norms.

Undoubtedly a party to a control agreement is not in as advantageous a position to complain of the invalidity of that agreement as might be a creditor or a minority shareholder. See Kantzler v. Bensinger, 214 Ill 589, 600, 73 NE 874; Faulds v. Yates, 57 Ill 416, 421; Fitzgerald v. Christy, 242 Ill App 343, 360; Bausch & Lomb Optical Co. v. Wahlgren, 1 F Supp 799, 803; E. K. Buck Retail Stores v. Harkert, 157 Neb 867. In the above cases the party setting up the illegality of the contract as a defense to his breach was doing so for personal reasons. The courts emphasized unconscionable conduct, taking advantage for a number of years and estoppel. In none of the above cases did the question of whether the affirmance of

the agreement be for the best interests of the corporation arise. See note, 3 University of Chicago Law Review 640, 650. We are presented with that element here.

No part of this agreement was performed, although, Emma Galler stands ready to perform an acceptance of the largesse written into the agreement for the benefit of Rose and her. The record shows that Isadore and Rose after signing the agreement never had any intention of enforcing it following the death of Benjamin. The record further shows that the immediate motivation for the signing of the agreement was the concern of all parties for the wishes of the failing Benjamin Galler. Negotiation concerning the terms of the agreement would have been highly inappropriate at that time. Prior to the death of Benjamin all appearances indicate that there existed nothing but good feelings between the members of the family. This is not a contractual background to which a court would apply the terms unconscionable and estoppel.

Determining whether an agreement should be stricken in whole or whether unobjectionable provisions should be severed is a confusing problem. Corbin discusses the rule in the following words:

> "It is generally assumed that enforceability depends on 'divisibility,' and that 'divisibility' depends on the terms of the bargain and the expressed intention of the parties. It is believed, however, that such an assumption makes the cart pull the horse in most cases, and that a bargain is described as 'divisible' only after the court has determined on grounds of policy that a part of it should be enforced. Public policy is not determined by the 'intention' of the parties or the 'terms' in which they have expressed their intention. To search for 'divisibility' generally obscures

463

the factors that should control the decision and that in almost all cases do in fact control it.

"The commonly repeated statement that a bargain that is illegal in part will be enforced as to the lawful part if the bargain is 'divisible' renders no good service so long as we have no workable test or definition of 'divisibility.' The converse statement that no part of such a bargain is enforceable if the bargain is 'entire' is equally useless. Not much better is the statement sometimes found, that the lawful part of a bargain will be enforced if it can be separated from the unlawful part without destroying the 'symmetry' of the bargain. It is only a little more enlightening to say that no part will be enforced if the unlawful is so intimately connected with the lawful as to 'taint' the whole. With no better generalizations than those to rely upon, the court is in fact rendering its decision on the basis of its judicial instinct for 'justice' or of some inarticulate major premise as to the requirements of 'public policy'. These are indeed a sounder basis for judicial action than are inaccurate analysis or the repetition of an ancient 'rule' no longer in harmony with living needs and practices. But as a system of law matures with experience, the sources of 'instinct' can be made known and the 'inarticulate' can be expressed." 6A Corbin on Contracts, Ch 90, § 1520, pp 754, 755.

In the case of Teich v. Kaufman, supra, the court was persuaded that the element of "illegal consideration" tainted the entire contract. In this case there are conflicting considerations. The fact that all shareholders were parties to the agreement encourages divisibility, but the undue duration, stated purpose and numerous deviations from the Business Corpora-

tion Act demand total illegality. The fact that the attacking party himself is a party to the agreement is somewhat mitigated since the attack is based upon the charge that the agreement disregards and is detrimental to the interests of the corporation. We feel that the undue duration, stated purpose and substantial disregard of the provisions of the Corporation Act outweigh any considerations which might call for divisibility and that the public policy of this state demands voiding this entire agreement.

■ The recommendations of the Master as approved by the court provided that the defendants, Isadore and Aaron Galler, shall account to the corporation for all monies received by each of them from the corporation since September 25, 1956, and such accounting shall be rendered by them to the corporation during said period, the burden to be upon them to prove the fair value of such services. The Master especially found that the accounting should go to the salaries of Isadore and Aaron Galler.

Section 45 of the Corporation Act provides:

> "Nothing herein contained shall impair the power of any court of competent jurisdiction, upon proof by a shareholder of proper purpose, . . . , to compel by mandamus or otherwise the production for examination by such shareholder of the books and records of accounts, minutes, and record of shareholders of a corporation." (Ill Rev Stats 1961, c 32, § 157.45.)

There is no doubt that Emma Galler's desire to examine the records and have an accounting is a proper purpose. See Miller v. Spanogle, 275 Ill App 335. It is even more important in the close corporation than in the publicly-held corporation that every shareholder should be able to compel an inspection of corporate

465

records and an accounting of monetary disbursements. See, 1 O'Neal Close Corporations, Ch 3, § 3.63.

Aaron and Isadore Galler have drawn salaries as President and Chairman of the corporation. They were validly elected officers prior to the death of Benjamin Galler and they receive no more compensation than was thought reasonable prior to the death of Benjamin. It is true that Aaron's salary was improperly raised $5000, and he should be made to account for that amount. The general rule remains that the failure of a corporate body to elect officers or directors does not end the terms of those previously elected. 2 Fletcher Cyclopedia Corporations, Ch 11, § 344. The same salary continues, but where there is a change of circumstances, the question of the amount of salary may become one of fact. 5 Fletcher Cyclopedia of Corporations, Ch 16, § 2136. In this case an accounting as to the salaries of these officers would be mere harassment. The record offers no basis for a finding that salaries which were reasonable prior to the death of Benjamin Galler should become suddenly unreasonable following his death. The record shows that the company's gross sales and profits increased substantially from 1957 to 1959, while the business was under the exclusive control of these two men. The salaries of $42,000 and $20,000 do not seem unreasonable for the chief officers of a $9,000,000 per year business. Emma Galler is further entitled to an accounting of monies, if any, received in excess of salaries received by Isadore and Aaron.

The Master's fees in this case are excessive. Originally the Master asked for $18,200 or $40 per hour for 455 hours work. The Chancellor reduced this fee to $15,925 or $35 per hour for 455 hours work. We believe that the Chancellor's determination is also excessive. The correct rule in awarding Master's fees is as simply stated in Kerner v. Peterson, 368 Ill 59, 82, 12 NE2d 884:

466

"The master's position and responsibility are inferior to those of the chancellor and his daily compensation should not be equal to or exceed the chancellor's compensation when reduced to a per diem basis."

See also Klekamp v. Klekamp, 275 Ill 98, 113 NE 852; 3 Nichols Illinois Civil Practice (1961), Ch 52, § 2950, pp 369, 370. We believe that a determination of a Chancellor's per diem should be made on the basis of a 229-day work year—reflecting weekends, one month's vacation and ten legal and court holidays. The highest possible salary of a Chancellor sitting on the Circuit or Superior Court of Cook County during the period of these hearings was $25,000. These hearings were conducted between February, 1960 and February, 1962. The Fees and Salaries Act (Ill Rev Stats 1961, c 53, § 3) makes no provision for a $29,000 salary for a judge elected prior to November 6, 1962. A five-hour day (approved in Strom v. Strom, 13 Ill App2d 354, 360, 142 NE2d 172) should be the daily measure. Using the above formula a Chancellor's approximate per diem earnings are $110 or $22 per hour. On this basis the Chancellor would receive $10,010 for 455 hours work. Although a Master's "position and responsibility are inferior to those of the Chancellor," the Master's hourly rate can be justified on the same basis because the Master must personally bear the cost of his office space and his staff while the Chancellor need not. We believe that a Master's fee of $10,010 in this case properly reflects the time and costs expended.

In accordance with the views of this opinion the decree awarding specific performance should be reversed, the orders directing an accounting to be taken should be affirmed in part and reversed in part, the order awarding Master's fees should be reversed with directions to enter an amount in conformity with the

views expressed herein, and the cause should be remanded for proceedings not inconsistent with this opinion.

Decree reversed in part, and affirmed in part, and remanded with directions.

FRIEND, J., concurs.

BURKE, P. J., dissenting in part:

The majority opinion agrees with the contention of the defendants that the 1955 agreement violates the Illinois Business Corporation Act and is therefore invalid and unenforceable. I am of the opinion that the agreement is valid, that it does not violate the Business Corporation Act and that it is enforceable. The agreement is not a voting trust. It was never intended to be a voting trust. The agreement does not contain the essential characteristics of that kind of a trust: the divorce of stock ownership from voting control. The shareholders remain shareholders. They hold and vote their own shares. They did not transfer or agree to transfer title or voting rights to any one. There is no alienation, no trust, no trustees or voting agents. Sec 30a of the Business Corporation Act deals only with voting trusts and its 10-year provision is obviously not applicable to the agreement. Agreements such as the one in the instant case have been upheld by the Supreme Court, regardless of their duration, in a line of decisions going back to Faulds v. Yates, 57 Ill 416.

The fact that the Galler agreement is not limited to 10 years is of no legal consequence. It is clear that this agreement has an inherent time limitation. Its essential provisions are operative only during the lives of Emma Galler and Rose Galler. They with their husbands agreed to constitute a four-member board of directors, and agreed that when a husband died

468

his widow would have the right to nominate a director to take his place. A wife could be a director and exercise her right to nominate a fellow director only during her lifetime. The duration of the agreement is thus limited. If one Galler family were to dispose of its shares to strangers, the strangers would be bound to cast their votes for the remaining widow and her nominee. If all the husbands and/or wives died, or disposed of all their shares, then the agreement would no longer be operative. Manifestly, the agreement is not for perpetuity. But the time element would have no bearing on its validity because it is not a voting trust and there is no public policy subjecting it to the time limitation imposed by the statute upon voting trusts. In Venner v. Chicago City Ry. Co., 258 Ill 523, 101 NE 949, the court said at 539: "There is no rule of public policy in this State which prohibits the combination of the owners of a majority of the stock of a corporation for the purpose of controlling the corporation."

A policy against agreements in which the voting rights are separated from stock ownership was at one time sanctioned in Luthy v. Ream, 270 Ill 170, 110 NE 273. But straight contractual voting control agreements never fell within the rule of Luthy. This was emphasized in Thompson v. J. D. Thompson Carnation Co., 279 Ill 54, 116 NE 648, wherein a control agreement of indefinite duration was upheld because it does not divest or attempt to divest J. M. Thompson of his control or ownership of his stock, or his right to vote the same. That straight contractual voting control agreements are not to be confused with voting trusts is emphasized in Fletcher Cyclopedia of Corporations, Permanent Vol 5, Sec 2064, at page 254, citing Thompson v. J. D. Thompson Carnation Co. The legislature saw fit when it enacted the voting trust statute in 1947 not to limit all voting control

agreements to a 10-year period. The statute makes no reference whatsoever and expresses no public policy with respect to straight voting agreements, although they have been common since before 1870 and they have often extended for more than 10 years, as in the Thompson case approved by the Supreme Court in 1917.

Defendants cite Abercrombie v. Davies, 130 A2d 338 (Del 1957) for the proposition that a statute sanctioning voting trusts for a 10-year period must be construed as limiting the duration of nontrust agreements. The Abercrombie decision does not so hold. This decision supports the proposition that the one essential feature that characterizes a voting trust is the separation of voting rights of the stock from other attributes of ownership. The Delaware Court held that the elaborate disguise resorted to in Abercrombie was fruitless and that it could not cover up the fact that the substance of the voting trust already existed. Abercrombie expressly recognizes that the agreement whereby shareholders undertake to combine in voting their own shares without the intervention of "agents," trustees or irrevocable proxies is valid. The Galler agreement is not a disguised, concealed or camouflaged voting trust.

The argument of the defendants that the agreement is violative of the statutory provisions vesting the duty to manage the affairs of the corporation in its board of directors, authorizing the shareholders to elect directors and restricting the corporation's right to purchase its own stock cannot be sustained. The gist of defendants' contention is that the 1955 agreement contains provisions which, it is claimed, the owners of 95% of the shares could not enter into without the consent of the then minority shareholder Manuel Rosenberg, who in 1954 contracted to purchase the other 5% of the shares. The enforcement of the con-

tract, as decreed, did not and could not work any advantage to a majority, or injury to a minority, for the reason that the minority interest had ceased to exist a year before the decree was entered.

Isadore banned his brother's widow from the premises and would give her no voice in the affairs, despite the fact that she owned the same number of shares as Isadore. It is clear that the 1955 agreement is valid and binding. Persons owning a majority of shares of a corporation have the unquestioned right to agree in advance to elect themselves directors and officers. Our Supreme Court was among the first to enunciate this rule in Faulds v. Yates, 57 Ill 416, setting a clear precedent which has been followed in other jurisdictions. Rosenberg's position as a minority shareholder had been secure under the terms of the October 1, 1945 contract with Benjamin and Isadore and would have remained secure had he chosen to remain a shareholder. When the several monetary benefits provided in Rosenberg's contract are compared to the limited pension provided for a widow under the 1955 agreement, it becomes evident that in ratio to his 5% stock interest the minority shareholder was on a par with, if not actually better treated, than a shareholder with a 47½% interest. It is apparent that the 1955 agreement was not intended and could not have adversely affected the minority shareholder. The Faulds decision was followed by Kantzler v. Bensinger, 214 Ill 589, 73 NE 874; Venner v. Chicago City Ry. Co., 258 Ill 523, 101 NE 949 and Thompson v. J. D. Thompson Carnation Co., 279 Ill 54, 116 NE 648.

The defendants support their position by citing Teich v. Kaufman, 174 Ill App 306. This Appellate Court opinion could not and does not take a contrary view to that taken by the Supreme Court in Faulds and Kantzler. The Teich opinion recognizes that a contract entered into by majority shareholders to elect

471

one another as directors, acquire control and management of the company and secure options on one another's stock is not against public policy. It is significant that the cases cited in Teich all involved agreements enhancing the personal profit of the contracting parties. The Galler agreement does not guarantee any salaries to officers, but contains only a widow's limited pension arrangement, which is not disproportionate to the death benefit the minority shareholder's widow or estate would have been entitled to had he died while a shareholder. The Teich case is not applicable to the factual situation of the case at bar. The fact that the Supreme Court cited Faulds v. Yates in its decision in Venner v. Chicago City Ry. Co., following the decision in Teich, makes it clear that Teich is not to be considered as changing the principle announced in Faulds v. Yates with respect to a noncomplaining minority.

Where the minority makes no complaint and where it does not appear that their interests would be adversely affected, the Faulds decision is directly in point. The agreement in no way impairs or diminishes the voting rights of the shareholders. Each outstanding share of Galler stock is entitled to one vote and in all elections for directors every shareholder has a right to vote for the number of shares owned by him. The agreement binds the parties to cast their votes for the widow and her nominee. It does not cut off the votes of any shares.

The defendants urge that the dividend provisions of the agreement are in conflict with Sec 41 of the Business Corporation Act. Although dividends are to be declared by the board of directors as provided by Sec 41, defendants say that the agreement curtails the discretion of the board. The dividend provisions of the Galler agreement are prudent and unexception-

able. They are predicated upon earned surplus and net earnings. Earned surplus must at all times be maintained at not less than $500,000. The directors are not required to declare any dividend if its payment would reduce the earned surplus to below $500,000. They are only required to declare a minimum dividend of $50,000 if its payment would not reduce the earned surplus below the $500,000 mark. If fifty percent of net earnings after taxes exceeds $50,000, then the directors may, in their discretion, declare a dividend of up to 50% of such annual profits. The reasonableness of these provisions becomes evident in the light of the financial condition of the company. In 1957, it had earned surplus of $1,380,510; its net earnings after taxes that year were $144,885. In 1958, its earned surplus increased to $1,543,270, and its earnings to $202,759. In 1959, its earned surplus further increased to $1,680,079, while its earnings were $172,964. The minority shareholder, had he continued to hold his stock, would have benefited proportionately from the dividend provisions. In Kantzler v. Bensinger, the Supreme Court upheld a provision for dividends in a shareholder's agreement similar to the one in the instant case. In Fitzgerald v. Christy, 242 Ill App 343, the court approved an agreement which bound the directors not to declare any dividends whatsoever except upon unanimous vote. In Lydia E. Pinkham Medicine Co. v. Gove, 20 NE2d 482 (Mass 1939) the Supreme Judicial Court of Massachusetts upheld the bylaw of a corporation requiring dividends to be declared each year in a sum equal to the net earnings in excess of the amount required to maintain a surplus of $1,000,000. In essence, there is no difference between the bylaw of a corporation and an equivalent agreement of the majority shareholders and directors empowered to establish such a bylaw, as in the case of the Galler agreement.

473

I agree with the holding of the majority that the plaintiff is not estopped. The evidence establishes that the defendants took unfair advantage of the plaintiff. The principle of estoppel operates only in favor of an innocent party who has changed position to his detriment in reliance upon fraudulent representations. It is the plaintiff who is the innocent party and the defendants who are guilty of oppressive misconduct and breach of faith. There should be an accounting as required by the decree. As the defendants did not ask the Chancellor to review any of the Master's rulings on the evidence as required by Rule 9.4 of the Superior Court, they are not in a position to urge that the Master erred in the exclusion of the proffered testimony. In 1961 the legislature increased the annual salary of the Circuit and Superior Court Judges of Cook County to $29,000, effective on reelection. In applying the formula discussed in the opinion, effect should be given to the $29,000 salary.

The decree should be modified only to the extent required to determine Master's Fees in accordance with the $29,000 salary discussed, and as modified only as to the Master's fees should be affirmed.